NILDA SANABRIA y JULIO CÉSAR IRIZARRY, demandantes y recurridos, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y recurrente.

*Número:* RE-89-442      *Resuelto:* 17 de febrero de 1993

*Jorge Pérez Díaz, Procurador General, Norma Cotti Cruz, Procuradora General Interina,* y *Sylvia Cancio Bigas, Procuradora General Auxiliar,* abogados del recurrente; *Santiago R. Palmer, Eduardo A. Quijano* y *Lorenzo Cabán Arocho,* abogados de los recurridos.

PER CURIAM:

# I

Aproximadamente desde los diecisiete (17) años, Alberto Irizarry Sanabria, nacido en Mayagüez, comenzó a tener problemas de comportamiento —disciplina y abandono de la escuela— que afectaron la interrelación con sus familiares inmediatos, a saber, su madre Nilda Sanabria y abuelas materna y paterna. Para esa época inició su carrera delictiva. Como menor se le imputaron varias faltas, pero siguiendo los consejos de su padre César Irizarry Martorell, obtuvo inmunidad y sirvió de testigo de El Pueblo. T.E. II, págs. 19–20.(¹) Subsiguientemente, se mudó a vivir con unos amigos en el área metropolitana (Bayamón). Fue acusado por delitos relacionados con armas, tentativa de asesinato, recibir propiedad hurtada, amenazas, escalamiento, apropiación ilegal agravada, robo y sustancias controladas. Convicto en múltiples instancias, estuvo preso en la Penitenciaría Estatal y en la Cárcel Regional de Bayamón.

En julio de 1985 se evadió de la Cárcel Regional de Bayamón y se dirigió hacia la zona oeste de la Isla, de donde era oriundo. Declarado prófugo de la justicia, el 25 de octubre de 1985 fue arrestado por otros delitos. Se le imputó entonces haber violado y sodomizado a una joven de Mayagüez. En esa fecha, en horas de la madrugada, fue ingresado y se encontraba solo en una celda de detenidos del cuartel de Mayagüez en espera del trámite judicial.

Ese día, Pablo Irizarry Mejías había acudido al edificio del tribunal de Mayagüez buscando a su novia, joven alegadamente perjudicada en los casos antes referidos. Al no encontrarla acudió al cuartel. Entró por el área de estacio-

---

(¹) Para fines expositivos, la *T.E. I* corresponde a la vista de 27 de julio de 1987, y la *T.E. II* al día 28.

namiento y le preguntó al policía Juan A. Vélez López quien tenía a su cargo el caso de su novia. Éste, entre otras cosas, le informó que se había arrestado a Alberto y le señaló la celda. Dicho agente prosiguió su camino con otro detenido. T.E. I, págs. 33–35. Irizarry Mejías se dirigió entonces a la celda al encontrar una puerta con la cerradura defectuosa y sin candado. Íd., págs. 41–42. "Es evidente que al dirigirse a la celda donde estaba Alberto Irizarry Sanabria, el codemandado Pablo Irizarry había contemplado atacar a éste. *No obstante, cualquier oportunidad que hubiera existido de que el codemandado abandonara dicha disposición quedó eliminada por la conducta de Alberto Irizarry Sanabria.*" (Énfasis suplido.) *Exhibit* I, pág. 6. Éste, al informarle el codemandado que era el novio de la agredida, se *jactó de su delito provocando al codemandado de forma aparentemente deliberada y se abalanzó sobre éste desde el otro lado de la reja para atacarlo.* El codemandado Pablo Irizarry, aunque no se encontraba en un peligro real, sacó su revólver y disparó contra Alberto, causándole la muerte.

Los familiares inmediatos de Alberto entablaron demandas contra el Estado Libre Asociado e Irizarry Mejías. Previa vista al efecto, el Tribunal Superior, Sala de Mayaguez (Hon. Germán J. Brau), concluyó que el Estado había incurrido en noventa por ciento (90%) de negligencia. En cuanto a Alberto Irizarry, encontró que si bien éste había sido "una persona con problemas de adaptación social y un extenso récord criminal, *lo que indudablemente afectó su relación con sus familiares*, lo cierto es que los lazos con sus padres y hermano *nunca desaparecieron.* Sus familiares mantuvieron, durante el tiempo que Alberto estuvo en prisión, una *actitud* de apoyo hacia dicho joven, con respecto al cual no perdían la esperanza de verlo rehabilitado". (Énfasis suplido.) *Exhibit* I, pág. 8.

Dicho foro concluyó que su muerte causó intensos sufrimientos a sus padres, por lo que les concedió la suma de

cincuenta mil dólares ($50,000) a cada uno, y la cantidad de veinticinco mil dólares ($25,000) a su hermano Julio César Irizarry. Redujo estas sumas a cuarenta y cinco mil dólares ($45,000) y veintidós mil quinientos dólares ($22,500), respectivamente, al imputarle a Alberto un diez por ciento (10%) de negligencia. Además, declaró con lugar la demanda de coparte del Estado contra Irizarry Mejías, a quien condenó a reembolsar al Estado, menos, claro está, la negligencia correspondiente al propio Estado.

Inconforme, acudió ante nos el Estado cuestionando, por exagerada, la concesión de esas partidas en vista de que se afectaron los lazos familiares por razón de los graves problemas confrontados por Alberto. Expedimos y autorizamos una transcripción de evidencia.

## II

■ Reconocemos una vez más que el sufrimiento humano no es entera ni perfectamente cotizable. El dolor y los sentimientos que pueden experimentar los progenitores y familiares cercanos por la muerte de un ser querido, resulta en extremo difícil de cuantificar. De ordinario, será el tribunal de instancia el que, por estar en mejor posición, evaluará todos los elementos visibles e intangibles que nutren ese tipo de determinación.

■ Sin embargo, esta norma de abstención no es absoluta: ha de ceder cuando la suma concedida sea exageradamente alta o ridículamente baja. *Urrutia v. A.A.A.*, 103 D.P.R. 643 (1975); *Publio Díaz v. E.L.A.*, 106 D.P.R. 854 (1978); *Canales Velázquez v. Rosario Quiles*, 107 D.P.R. 757 (1978); *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443 (1985). Entre los factores que han de considerarse pertinentes al caso están la estabilidad del núcleo familiar —aquí ambos progenitores se habían divorciado, incluso el padre tuvo tres (3) hijos más después— y la naturaleza y solidez de los

lazos familiares, ello manifestado por el contacto, interés, etc.

Hemos evaluado cuidadosamente la prueba documental, tanto la estipulada como la otra admitida, al igual que la testifical. Indudablemente reflejan que las visitas que los demandantes hicieron a Alberto mientras estuvo confinado fueron limitadas. Aunque coincidimos con la ilustrada sala sentenciadora de que ciertamente los lazos familiares no desaparecieron en su totalidad, la vida delictiva de Alberto los tronchó sustancialmente. Advertimos que durante el período del 1984 su madre y hermano Julio César lo visitaron en la cárcel en *sólo* dos (2) ocasiones. En 1985 ella lo visitó en Bayamón únicamente una (1) vez, el 28 de julio.

Si bien el tribunal concluyó, además, que el padre "lo llegó a visitar a la Cárcel de Bayamón, manteniéndose en comunicación con él por correo" (*Exhibit* I, pág. 4), del examen de los récord de visitas firmados de la Penitenciaría Estatal de Río Piedras y la Institución Regional Metropolitana de Bayamón no se desprende ese hecho. Por el contrario, la lectura de los testimonios de la madre Nilda (T.E. I, págs. 120–158), su padre César (T.E. II, págs. 8–84) y su hermano Julio César (T.E. I, págs. 99–120), demuestra que los vínculos familiares se debilitaron bastante con la ausencia voluntaria de Alberto y, naturalmente, sus fechorías.[2] Pecaríamos de ingenuos si negamos esta realidad.

En las circunstancias de autos, estimamos que las su-

[2] Curiosamente, su madre declaró que *desconocía* cuánto tiempo tenía que cumplir en prisión y cuánto le faltaba para salir. T.E. I, págs. 129 y 143. También, testificó que no sabía que se había evadido de la cárcel (T.E. I, pág. 128), aun cuando fue objeto de noticia en la prensa. T.E. II, págs. 75–76. Ella y el padre en sus respectivos testimonios mencionaron unas cartas, pero ninguna fue presentada en evidencia. T.E. I, pág. 121; T.E. II, págs. 49 y 54. Su padre también aceptó que no sabía dónde Alberto vivía después de irse y mientras estuvo en el área metropolitana. T.E. II, pág. 70. Admitió que no se interesó en saber por qué estaba preso en la segunda ocasión. T.E. II, pág. 72.

mas concedidas son exageradamente altas. *Urrutia v. A.A.A.*, supra. Reconocemos que ninguna muerte es totalmente reparable de forma económica. Cada ser humano único goza de elementos físicos y mentales distintos y valores distinguibles. Procede disminuir las sumas concedidas a la mitad. Desde joven Alberto optó por abandonar su residencia familiar, mantuvo poco contacto con sus familiares y al momento de su muerte contaba con veinticinco (25) años.

Aplicada la negligencia comparada previamente fijada por el tribunal de instancia, procede dictar sentencia que condena al Estado Libre Asociado a satisfacer a su padre César Irizarry diez mil dólares ($10,000), igual cantidad a su madre Nilda Sanabria y cinco mil dólares ($5,000) a su hermano Julio C. Irizarry Sanabria. *Se dictará la correspondiente sentencia y se remitirán los autos originales al foro de instancia.*

La Juez Asociada Señora Naveira de Rodón emitió una opinión disidente, a la cual se unieron el Juez Presidente Señor Andréu García y el Juez Asociado Señor Fuster Berlingeri.

— O —

Opinión disidente emitida por la Juez Asociada Señora Naveira de Rodón, a la cual se unieron el Juez Presidente Señor Andréu García y el Juez Asociado Señor Fuster Berlingeri.

Por entender que las cuantías concedidas en revisión por concepto de angustias y sufrimientos mentales, a pesar de haber sido reducidas, aún son excesivamente altas a la luz de los hechos particulares de este caso, no podemos suscribir la posición de la mayoría de este Tribunal y emitimos Opinión Disidente.

I

*Los hechos*

Los esposos Nilda Sanabria y César Irizarry procrearon dos hijos en su unión matrimonial: Alberto y Julio César. Para 1972, decidieron poner fin a su vínculo matrimonial mediante divorcio. Ante tal determinación, la señora Sanabria se fue a vivir con sus dos hijos a casa de su madre. Posteriormente, tanto el señor Irizarry como la señora Sanabria contrajeron nuevas nupcias.(¹)

Para 1977 Alberto Irizarry Sanabria contaba con diecisiete (17) años de edad. Desde ese entonces comenzó a evidenciar problemas de comportamiento, los cuales se manifestaban en actos de indisciplina. Abandonó la escuela y se fue de casa de su señora madre.

Ante la conducta asumida por Alberto, su señor padre, en vez de llevárselo a vivir con él,(²) le consiguió un apartamento en Mayagüez. Luego le consiguió alojamiento en casa de su abuela paterna.(³)

Los problemas de comportamiento continuaron, y a la temprana edad de diecisiete (17) años se le imputó a Alberto su primera falta como menor; en esta ocasión obtuvo inmunidad al servir como testigo de El Pueblo.

---

(¹) El Sr. César Irizarry se casó en 1974, y de esa nueva unión procreó tres hijos. La Sra. Nilda Sanabria se casó en 1984.

(²) De la transcripción de evidencia correspondiente a la vista de 28 de febrero de 1989, en las págs. 37–38, surge la verdadera razón por la cual el padre de Alberto no se lo llevó a vivir con él.

"P. ¿Por qué cuando Alberto le mencionó que no quería vivir más en el campo, usted no se lo llevó a vivir con usted?

"R. Porque este...lo que surge ahí con él, es que yo le decía, mira en casa hay que vivir de una forma que no ...que tú no la estas [sic] usando como se debe. En casa tiene que estar a las nueve.... Si tú necesitas, lo que necesites, tú lo pides. Y...el [sic] no... tomó encomienda... 'Yo no me acostumbro a la disciplina que se impone en tu casa, papi', me lo dijo. Entonces...

"P. ¿En tu casa, en la suya, con su nueva esposa... [sic]

"R. (Ininteligible) si no es mala, todo es cuestión...."

(³) El joven Alberto tuvo dificultades en ambos sitios. Así consta en las determinaciones de hechos que hizo el juez de instancia como parte de la sentencia.

Más tarde se mudó con unos amigos al área metropolitana, en Bayamón. Fue acusado por delitos de tentativa de asesinato, recibir propiedad hurtada, amenazas, escalamiento, sustancias controladas, apropiación ilegal agravada, robo, etc. Una vez convicto, estuvo preso en la Penitenciaría Estatal y en la Cárcel Regional de Bayamón.

Se evadió de la Cárcel Regional de Bayamón en julio de 1985. Mientras estaba evadido y habiéndosele declarado prófugo de la justicia, violó y sodomizó a una joven en Mayagüez.

El 25 de octubre de 1985 fue arrestado por otros delitos y se le imputó, además, los de violación y sodomía. Fue llevado al cuartel de Mayagüez durante la madrugada y allí fue ingresado en la celda de detenidos.

Mientras, el novio de la perjudicada se personó al cuartel en busca de su novia. Éste iba armado. Allí el policía Juan A. Vélez López le informó que se había arrestado a Alberto y le señaló la puerta de acceso a la celda de los detenidos, y prosiguió su camino.

El señor Irizarry Mejías, aprovechándose de que no había agente del orden público vigilando el área, se dirigió a la celda donde se encontraba Alberto. Logró fácil acceso ya que la puerta que conducía a la celda tenía la cerradura defectuosa y no tenía candado.

Una vez adentro, el señor Irizarry Mejías le informó a Alberto que él era el novio de la perjudicada. Este último, a su vez, se "jactó" de su delito provocando al señor Irizarry Mejías y abalanzándose sobre éste desde el otro lado de la reja para atacarlo. El señor Irizarry Mejías, pese a no encontrarse en una situación de peligro por encontrarse Alberto dentro de la celda, sacó su revólver y disparó contra éste ocasionándole la muerte.(4)

---

(4) Por estos delitos fue acusado de asesinato en primer grado el señor Irizarry Mejías y de incurrir además en infracción a la Ley de Armas de Puerto Rico, Arts. 6 y 8 (25 L.P.R.A. secs. 416 y 418). Tras un juicio por jurado, fue declarado culpable por el delito de homicidio voluntario. Véase la sentencia del tribunal de instancia, pág. 7.

A consecuencia de esos hechos, la madre y el hermano del occiso instaron una demanda en contra del Estado Libre Asociado de Puerto Rico, la Policía de Puerto Rico, Pablo Irizarry Mejías, Esther Lugo Lamberty y la sociedad legal de gananciales compuesta por éstos.([5]) En síntesis, se le imputó negligencia a los demandados por el hecho de dejar la puerta del cuartel abierta sin vigilancia alguna y no haber brindado protección al detenido. Posteriormente, los demandantes desistieron de su reclamación contra el señor Irizarry Mejías y su esposa. El Estado, por su parte, instó una demanda contra coparte en contra del señor Irizarry Mejías.

El padre del occiso, señor Irizarry Martorell, también instó una demanda por los mismos hechos y le imputó culpa y negligencia al Estado.([6]) Ambos casos fueron consolidados.

El tribunal de instancia determinó que

[l]as causas de la muerte de Alberto Irizarry Sanabria, además de la conducta intencional del codemandado Pablo Irizarry, lo fueron la conducta de los agentes del orden público del Cuartel, quienes no tomaron medida alguna para proteger la seguridad del arrestado, propiciando más aún, que su matador lo identificara y le diera muerte mientras se encontraba solo en una celda, así como la propia conducta temeraria del occiso quien, lejos de tratar de aplacar la ira del codemandado, lo provocó y atacó desde su celda, motivando que éste abriera fuego en su contra. El primero de estos factores, sin embargo, claramente fue la causa principal de los hechos, que el Tribunal estima en un 80%, correspondiendo a las otras dos causas mencionadas una proporción menor, que el Tribunal fija en un 10%, cada una.

A tales efectos, el tribunal de instancia concedió a los padres del occiso, por concepto de sufrimientos y angustias mentales, la cantidad de cincuenta mil dólares ($50,000) a

---

([5]) Caso Civil Núm. CS-86-299.

([6]) Caso Civil Núm. CS-86-762.

cada uno y al hermano la cantidad de veinticinco mil dólares ($25,000). Estas cantidades fueron reducidas a cuarenta y cinco mil (45,000) y veintidós mil quinientos dólares ($22,500), respectivamente, luego de reducirle el diez por ciento (10%) de negligencia que se le imputara al occiso.

Inconforme con esta determinación, recurrió en revisión ante nos el Estado cuestionando las cuantías concedidas por concepto de sufrimientos y angustias mentales por entender que en el presente caso los lazos afectivos de esta familia se habían deteriorado por la conducta delictiva de Alberto.

Luego de decidir revisar y expedir el auto solicitado, una mayoría de este Tribunal redujo las cantidades antes mencionadas a diez mil (10,000) dólares para cada uno de los padres y cinco mil (5,000) al hermano. La razón que se aduce para ello es que "[d]esde joven Alberto optó por abandonar su residencia familiar, mantuvo poco contacto con sus familiares y al momento de su muerte contaba con veinticinco (25) años". Opinión mayoritaria, págs. 774–775. Precisamente, por esta misma razón, reduciríamos aún más tales cantidades.

Por otra parte, consideramos irrazonable y contradictorio que se le haya concedido al padre una cuantía idéntica a la de la madre del occiso, cuando la mayoría de este Tribunal reconoce que la prueba claramente demostró que el padre mantuvo menos contacto con el occiso. Como cuestión de hecho, nunca lo visitó mientras estuvo en la cárcel. Se afirma en la sentencia de este Tribunal, pág. 774, que

[s]i bien el tribunal concluyó, además, que el padre "lo llegó a visitar a la Cárcel de Bayamón, manteniéndose en comunicación con él por correo" (*Exhibit* I, pág. 4), del examen de los récord de visitas firmados de la Penitenciaría Estatal de Río Piedras y la Institución Regional Metropolitana de Bayamón no se desprende ese hecho. Por el contrario, la lectura de los testimonios de la madre Nilda (T.E. I., págs. 120–158), su padre

César (T.E. II, págs. 18–84) y su hermano Julio César (T.E. I, págs. 99–120), demuestra que los vínculos familiares se debilitaron bastante con la ausencia voluntaria de Alberto y, naturalmente, sus fechorías. Pecaríamos de ingenuos si negamos esta realidad. (Escolio omitido.)

Sostenemos, además, que este Tribunal no ha tomado en consideración los criterios esbozados en casos anteriores similares a éste para comparar la cuantía concedida por concepto de sufrimientos y angustias mentales. Un estudio comparativo demuestra con meridiana claridad que la cuantía concedida en revisión es exageradamente alta.[7] Con relación a la concesión de daños por concepto de angustias mentales por la muerte de un hijo, veamos cuál ha sido la trayectoria jurisprudencial.

## II

A partir de *Moa v. E.L.A.*, 100 D.P.R. 573, 587 (1972), hemos sostenido que el sufrimiento que experimenta un padre por la pérdida de su hijo es "un hábito ordinario de la vida, un proceso psíquico inevitable en todo ser humano normal. Ello es de reconocimiento común y general, notorio e indisputable, que en el nivel de las pruebas, es o debe ser de conocimiento judicial, aun cuando no se ofrezca evidencia alguna al efecto". (Escolio omitido.)

No obstante, hicimos hincapié en que cuantificar el dolor y sufrimiento no es tarea fácil. Es necesario, entonces, que el reclamante aporte los factores de evidencia necesarios para poder determinar el valor de tales daños y que dicha evaluación se haga de una forma justa y razonable. Debe probar el reclamante "que no se trata de una simple pena pasajera, sino que, en alguna medida apreciable ... quedó afectado en su salud, bienestar y felicidad". *Moa v E.L.A.*, supra, pág. 587. Además, hemos sostenido reitera-

---

[7] Véanse las gráficas que se acompañan como Apéndices I, II y III.

damente que los daños no tienen que probarse con certeza matemática. *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990).

Un factor a considerar a la hora de hacer la valoración de los daños tiene que ser el vínculo familiar existente. Por ello nos referimos a cuán estrecha era la relación entre el núcleo familiar. Dicho criterio fue señalado en la opinión concurrente emitida por el Juez Asociado Señor Alonso Alonso en *Velázquez Ortiz v. U.P.R.*, 128 D.P.R. 234 (1991), al expresar que este Tribunal no tomó en consideración dicho criterio y concedió una cuantía por concepto de sufrimientos y angustias mentales que, a su juicio, era irrazonable por ser ridículamente baja. En dicho caso sostuvo:

> En el caso de autos se trata de valorizar los daños mentales de los seres humanos que compartían la realidad social de pertenecer a una familia puertorriqueña extendida pero unificada. Entra en juego y se activa el sentido de justicia de quien valoriza el dolor ante *el quebrantamiento de los lazos afectivos, sentimentales y emocionales de este grupo familiar particular.* (Escolio omitido y énfasis suplido.) *Velázquez Ortiz v. U.P.R.*, supra, pág. 240.

Aplicado lo anterior al caso de autos, no podemos concluir que se trataba de un núcleo familiar con fuertes vínculos y lazos afectivos. Al contrario, la prueba que desfiló demostró que los padres del occiso ni tan siquiera sabían por cuáles delitos había sido convicto su hijo. El padre nunca lo visitó en la cárcel y la madre lo visitó en apenas cuatro (4) ocasiones. El hermano, por su parte, lo visitó sólo en muy pocas ocasiones. Así lo reconoce la mayoría de este Tribunal en la nota al calce número dos (2) al señalar lo siguiente:

> Curiosamente, su madre declaró que *desconocía* cuánto tiempo tenía que cumplir en prisión y cuánto le faltaba para salir. T.E. I, págs. 129 y 143. *También, testificó que no sabía que se había evadido de la cárcel* (T.E. I, pág. 128).... Ella y el padre en su respectivos testimonios mencionaron unas cartas, pero ninguna fue presentada en evidencia. T.E. I, pág. 121; T.E. II,

págs. 49 y 54. Su padre también aceptó que no sabía dónde Alberto vivía después de irse y mientras estuvo en el área metropolitana. T.E. II, pág. 70. Admitió que no se interesó en saber por qué estaba preso en la segunda ocasión. T.E. II, pág. 72. (Énfasis suplido y en el original.) Opinión mayoritaria, pág. 774 esc. 2.

Los hechos antes reseñados no demostraron que la pérdida de su hijo o hermano, según fuera el caso, fue una apreciable que afectó de forma significativa la salud, el bienestar y la felicidad de los demandantes. La relación fue una más bien esporádica. La conducta del occiso, claramente antisocial, obviamente había deteriorado las relaciones familiares al punto de que éstas se mantenían, a lo sumo, a un mínimo.

Por tal razón, tomando en consideración la frágil prueba presentada por la parte demandante con respecto a los sufrimientos mentales y emocionales de los padres y hermanos del occiso, estimamos éstos en cinco mil dólares ($5,000) para la madre, dos mil quinientos dólares ($2,500) para el padre y mil quinientos dólares ($1,500) para el hermano.

# APÉNDICE I

Apéndice I

## ANALISIS DE COMPENSACIONES POR SUFRIMIENTOS Y ANGUSTIAS MENTALES EN CASOS DE MUERTE DE HIJO

| NOMBRE DEL CASO | S/O | EDAD | COMPENSACION CONCEDIDA TRIBUNAL DE INSTANCIA | | | | | COMPENSACION REVISADA TRIBUNAL SUPREMO | | | | | FECHA REVISION | % AUMENTO/REBAJA PROCESO REVISION | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I- MUERTE HIJOS | | | Madre | Padre | Hno > | Hno.< | /Abuelo | Madre | Padre | Hno. | Hijo | /Abuelo | | Madre | Padre | Hijo | Hno. /Abuelo |
| Mena Otero V. Mun. Santa Isabel | S | | $16,000 | N/A | $5,000 | $5,000 | N/A | $5,000 | | $500 | $500 | | 1992 | -65.67% | N/A | -90.00% | N/A |
| Georgina Diaz V. José M. Sotá | S | 16 | $65,000 | N/A | $16,000 | $5,000 | N/A | ** | | $500 | $500 | | 1991 | N/A | N/A | N/A | N/A |
| Velázquez Ortiz y Otros V. U.P.R. | S | 3 | N/A | N/A | $7,500 | $5,000 | $3,500 | N/A | N/A | $10,000 | $10,000 | $10,000 | 1991 | N/A | N/A | 33.3% | 185.7% |
| Colón V. Municipio Guayama | O | 23 | N/A | $5,000 | $5,000 | N/A | N/A | ** | N/A | $5,000 | $5,000 | N/A | 1983 | 0.00% | N/A | 100.0% | N/A |
| Zeno Molina V. Vázquez Rosario | O | 21 | $10,000 | $10,000 | $5,000 | $5,000 | N/A | $10,000 | $10,000 | $5,000 | $5,000 | N/A | 1977 | 0.00% | 0.00% | 0.0% | N/A |
| González V. Municipio Loiza | O | 4 | $25,000 | $25,000 | N/A | N/A | N/A | $10,000 | $10,000 | N/A | N/A | N/A | 1976 | -60.00% | -60.00% | 0.0% | N/A |
| Sanchez V. Liberty Mutual Ins. Co. | O | | $50,000 | $25,000 | $30,000 | $5,000 | N/A | $25,000 | $10,000 | $5,000 | $2,000 | N/A | 1971 | -50.00% | -60.00% | -93.3% | N/A |

Criterio:
1. Frágil prueba presentada.
6. Padres no estaban casados ni vivían juntos.
7. Aumento en el costo de vida.

Nota:
** No acudieron en revisión en cuanto a esta partida

LEYENDA
S = Sentencia
O = Opinión

# APÉNDICE II

## COMPENSACION POR SUFRIMIENTOS Y
### ANGUSTIAS MENTALES EN CASOS DE MUERTE
### DE HIJOS

# APÉNDICE III

## COMPENSACION POR SUFRIMIENTOS Y
### ANGUSTIAS MENTALES EN CASOS DE MUERTE
### DE HIJOS

