# 2007 DTA 86

**TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE BAYAMÓN Y ARECIBO
PANEL VII**

RAFAEL RODRÍGUEZ LÓPEZ, ETC.
Apelados

v.

HÉCTOR ALVARADO TIZOL, ETC.
Apelantes

Núm. KLAN-2005-01387

San Juan, Puerto Rico, a 27 de junio de 2007

Panel integrado por su Presidente, el Juez Rivera Román,
el Juez Salas Soler y la Juez Coll Martí

Rivera Román, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Los hechos ante nuestra consideración se inician con el derrumbe de una verja medianera entre dos propiedades. Como consecuencia de la caída de la verja medianera, una gran cantidad de agua se desplazó desde un predio hacia la propiedad del vecino.

El caso ante nuestra consideración nos obliga a determinar quién es el responsable de la caída de la verja medianera y, por ende, de los daños ocasionados por la inundación de agua que discurrió hacia el predio del vecino.

## I

Examinemos los hechos del caso. El Dr. Rafael Rodríguez López y su esposa, la Sra. Kristina Evans Easter, son propietarios de una residencia ubicada en el Núm. 42 del Camino Tortugo, en Beverly Hills, en el Municipio de Guaynabo. La propiedad colinda con la residencia del Dr. Héctor Alvarado Tizol y su esposa, la Sra. Carmen Muñoz Holding.

Las propiedades están separadas por una verja medianera que construyó un anterior dueño de la residencia de los Rodríguez-Evans.

La verja es una estructura de ocho pies de altura y 185 pies de longitud. La verja tenía varios desagües en material PVC, de unas cuatro pulgadas de diámetro. Los desagües estaban ubicados en la parte baja de la verja y permitían recibir el agua acumulada en la propiedad de los Alvarado-Muñoz y dirigirla fuera del solar. El mantenimiento de los desagües de la verja lo realizaba un jardinero identificado como el señor Juan Ríos Delgado (alias Wiso).

La propiedad de los Alvarado-Muñoz está ubicada a un nivel más alto que la propiedad de los Rodríguez-Evans. El solar de los Alvarado-Muñoz tenía en la parte central del patio una depresión enorme que acumuló una gran cantidad de agua.

Durante los días previos al 25 de noviembre de 1999, hubo lluvias que provocaron la acumulación de agua en el predio de los Alvarado-Muñoz. La acumulación de agua se estimó en la sentencia del Tribunal de Instancia en unos cuatro pies de alto.

Los Rodríguez-Evans no podían apreciar, desde su propiedad, el agua acumulada en el patio de su vecino.

El referido 25 de noviembre, un yerno de los Alvarado-Muñoz y el jardinero Wiso intentaron, sin éxito, destapar los desagües utilizando una cinta de destape y una varilla. A pesar de que no se logró solucionar la seria situación, nadie advirtió a los Rodríguez-Evans sobre la acumulación de aguas en el patio contiguo.

La cantidad de agua acumulada en el patio de los Alvarado-Muñoz provocó el colapso de la verja. La caída ocurrió desde la propiedad de los Alvarado-Muñoz hacia la de los Rodríguez-Evans. Como consecuencia de la caída de la verja medianera, un golpe de agua, tierra y broza entró a la residencia de los Rodríguez-Evans. El episodio ocurrió con tal fuerza que provocó temor e inseguridad en las personas que compartían en la casa de los Rodríguez-Evans y celebraban el Día de Acción de Gracias. El golpe de agua trasladó hasta la propiedad de los Rodríguez-Evans tierra, escombros, porquería, excremento de caballo y causó daños a los autos y al mobiliario de la casa.

En la residencia de la familia Rodríguez-Evans, para el momento en que ocurre la caída de la verja, se encontraban presentes ambos padres del Dr. Rafael Rodríguez López, la sobrina *"Maru"*, la Sra. Kristina Evans Easter y las dos hijas de los Rodríguez-Evans de 11 y 2½ años de edad respectivamente. (Véase, Transcripciones

160

del Juicio en su Fondo, págs. 24 y 27). El relato de la Sra. Kristina Evans Easter describió lo ocurrido el día de Acción de Gracias de la siguiente forma:

*"Pues, estaba preparando todo y de momento estaba Maru, la sobrina de mi esposo, en la cocina, y escuchamos un ruido bien duro, una explosión. La verdad es que como estábamos en la cocina no sabíamos lo que había pasado. Cuando Maru fue detrás del 'family' al área donde se podía ver el área de entrada, el 'driveway', lo que ella veía es que el muro venía para abajo y detrás del muro había como una ola de agua. Cuando yo llegué al 'family' ya el agua...que tienen unas puertas francesas, habían alcanzado como a la mitad de la puerta".* Véase, Transcripciones del Juicio en su Fondo, pág. 25.

Posteriormente, en la continuación de la descripción de lo sucedido al derrumbarse la verja y entrar agua a su propiedad, la Sra. Evans Easter relata la siguiente serie de eventos:

*"[...] Entonces había la preocupación, estaban mis hijas, estuvimos corriendo buscándolas. Estaban mis suegros. ¿Qué hago? ¿Abro la puerta? Si no la abro se puede derrumbar eso también. Había un pequeño caos de momento. Porque uno no sabía. El agua seguía bajando y bajando. Se llenaron las bañeras con agua, con fango, con excreta de caballo, porque el Dr. Héctor Alvarado Tizol tiene caballos. Todo lo que estaba en el patio de ellos [de los Alvarado-Muñoz] venía para mi casa. Las alfombras, los muebles, el nivel del agua seguía subiendo en la cocina, que estaba sobrepasando el nivel... los gabinetes de nosotros no llegan hasta el piso, están levantados. Se pasó [el agua] el nivel de la puerta".* Véase, Transcripciones del Juicio en su Fondo, págs. 26-27.

La descripción del instante en que se desploma la verja y observa el torrente de agua que entra a la residencia causó temor e inseguridad a la señora Evans. Recuérdese que ella estaba en la casa junto a sus hijos menores e edad, su sobrina y sus suegros, pues celebraban el Día de Acción de Gracias.

Del testimonio de la Sra. Muñoz Holding surge que, para la fecha de los hechos, en la propiedad de los Alvarado-Muñoz habían diez (10) caballos y cuatro (4) perros grandes. Véase, Transcripciones del·Juicio en su Fondo, pág. 415. Inevitablemente estos animales hacían sus necesidades fisiológicas en la propiedad, aunque los Alvarado-Muñoz señalan que cuentan con un muchacho que trabaja a tiempo completo y se encarga de la limpieza de los establos. (Véase, Transcripciones del Juicio en su Fondo, pág. 416).

La Sra. Evans Easter admite que del lado de su propiedad, que era lo único que podía ver, el agua fluia por los tubos y nunca le pasó por la mente que iba a tener un problema. (Véase, Transcripciones del Juicio en su Fondo, pág. 70). Incluso, señala que el día de los hechos y el anterior a éste, la acumulación de agua en su propiedad no era fuera de lo normal. (Véase, Transcripciones del Juicio en su Fondo, pág. 93). Ante preguntas del abogado de la otra parte, describe el día de los hechos como uno normal de lluvia, en el cual no se había acumulado agua en su propiedad; por tanto, no había pensado en la posibilidad de un problema. (Véase, Transcripciones del Juicio en su Fondo, pág. 94). Además, a su entender, el agua bajaba de los desagües como siempre. (Véase, Transcripciones del Juicio en su Fondo, pág. 98).

Por su parte, el Dr. Rafael Rodríguez López, en su recuento del escenario que encontró al llegar a su hogar el día del derrumbe de la verja, expresa lo siguiente:

*"Yo subo, me paro frente al portón, le doy al 'beeper', abre, y cuando me acerco un poco más lo que encuentro es todo, los ciento y tanto pies del 'driveway' completo está lleno de concreto. Es como si hubiesen cogido el muro y lo hubiesen tirado con todo el... a través de toda la ruta desde que uno entra hasta el 'driveway', lleno de agua, cocos, palmas. El vehículo de mi papá estaba encima del Lexus. Había unas cisternas azules que estaban flotando en agua todavía. Y obviamente yo dije: "¿Y qué es esto?" Pues, yo pensaba que era una fractura, se fracturó el muro y no hay problema. Pero no pensé que aquello estaba abierto completamente. Me paro, tengo que caminar por encima de todos los mu... y en dirección a la casa, miro, y está toda la gente en*

*esta fiesta en el balcón alto mirando hacia abajo, así. Y yo miro para arriba y digo: "Pero, pero, pero... ¿Qué es esto?"Cuando entro, pues, está obviamente mis dos hijas sobre el 'counter', mi padre pálido y callado, mi señora allí loca...". ¿Qué vamos a hacer ahora? ¿Qué vamos a hacer ahora?" Y básicamente ese es el panorama con el cual yo me encuentro allí. Toda la casa llena de plantas y de agua con fango. Una cosa desastrosa. Jamás pensé yo que el muro roto iba a hacer que se cayeran ciento cuarenta y pico de pies de muro completo. Era como si lo empujasen completo".* Véase, Transcripciones del Juicio en su Fondo, págs. 112-113.

A raíz de ese incidente, el 21 de noviembre de 2000, los Rodríguez-Evans presentaron una demanda en daños y perjuicios contra sus vecinos, los Alvarado-Muñoz. La demanda fue contestada y se presentó una reconvención. Cada vecino alega en su reclamación que el derrumbe de la verja medianera es responsabilidad del otro y solicitaron compensación por daños y perjuicios.

Luego de varios trámites procesales, que incluyen una inspección ocular, el T.P.I. dictó sentencia el 16 de septiembre de 2005 en la cual declaró ha lugar la demanda y desestimó la reconvención. El Tribunal concedió $75,000 por daños a la propiedad, $15,000 por sufrimientos y angustias mentales a la señora Evans, $10,000 al señor Rodríguez y $5,000 por concepto de honorarios de abogado.

Los daños adjudicados por el Tribunal de Instancia atienden los sufrimientos y angustias mentales del matrimonio Rodríguez-Evans y los daños a la propiedad. La compensación nos parece razonable y, conforme la doctrina vigente, no deben ser alterados, salvo que sean claramente irrazonables.

Inconformes con la determinación, los Alvarado-Muñoz presentaron un recurso de apelación en el cual alegan que:

*"Erró el tribunal al resolver que el titular de un predio sirviente no responde ni es responsable por la acumulación de aguas y daños que ocurre en una verja construida por su predecesor en título que impide el libre flujo natural del predio dominante al predio sirviente.*

*Erró el tribunal al resolver que el sucesor en título de un propietario que construyó una verja negligentemente no responde por su colapso.*

*Erró el tribunal al hacer conclusiones de hechos no basadas en prueba directa y particularmente inconsistentes con hechos admitidos, estipulados o aceptados como aprobados por el propio tribunal. Erró igualmente el tribunal al descartar, sin fundamento alguno, prueba directa única y hacer conclusiones de hechos basadas en meras especulaciones."*

Algunos de los señalamientos de error están relacionados con la apreciación de la prueba realizada por el Tribunal de Instancia. A los fines de evaluar éstos, los Alvarado-Muñoz sometieron una transcripción de la prueba oral desfilada durante el juicio. ■

## II
### 1. Los daños y perjuicios y la apreciación de la prueba

En nuestro ordenamiento jurídico, el que por acción u omisión causa daño a otra persona, por su culpa o negligencia, está obligado a reparar el daño causado. Artículo 1802 del Código Civil, 31 L.P.R.A. sec. 5141. Existe una causa de acción por daños y perjuicios al amparo del Art. 1802 del Código Civil, *supra*, si se establece la existencia de un daño real, si ha mediado culpa o negligencia y si existe una relación causal entre el daño causado y la conducta culposa o negligente. *J.A.D.M. v. Centro Com. Plaza Carolina*, 132 D.P.R. 785, 795 (1993).

Los sufrimientos y angustias mentales que se alegan en una demanda tienen que ser probados para que sean compensables. *Quiñones v. San Rafael Estates S.E.*, 143 D.P.R. 756, 774 (1997). Ante una reclamación de daños morales, es necesario que el reclamante aporte la evidencia necesaria para poder determinar su valor y que la evaluación del tribunal se haga de forma justa y razonable. *Sanabria v. E.L.A.*, 132 D.P.R. 769, 779 (1993).

En cuanto a la apreciación de la prueba desfilada ante un tribunal de instancia, el alcance de la revisión judicial sobre cuestiones de hechos está regulado por la Regla 43.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III. En lo pertinente, la aludida regla dispone que: *"...las determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos..."*. Como norma general, no debemos intervenir con las determinaciones de hechos del foro de instancia para sustituir el criterio del juzgador que tuvo la oportunidad de presenciar la declaración de los testigos, de verlos declarar y de apreciar su *demeanor. Ramos Acosta v. Caparra Dairy Inc.*, 113 D.P.R. 357, 365 (1982).

La deferencia reconocida aplica a las determinaciones de hechos basadas en testimonio oral, pues es el juzgador de los hechos quien observa el comportamiento de los testigos, lo cual constituye un aspecto de vital importancia al adjudicar credibilidad. *Pueblo v. Dávila Delgado*, 143 D.P.R. 157, 173 (1997).

Las determinaciones de hechos de instancia nos merecen deferencia en ausencia de pasión, prejuicio, parcialidad o error manifiesto del foro sentenciador. *Monllor Arzola v. Sociedad de Gananciales*, 138 D.P.R. 600, 610 (1995).

Los foros apelativos pueden dejar sin efecto las determinaciones de hechos realizadas por el Tribunal de Instancia, siempre que del examen de la totalidad de la evidencia queden convencidos de que el error ha sido cometido, como en el caso en que las conclusiones de hecho estén en conflicto con el balance más racional, justiciero y jurídico. *Méndez v. Morales*, 142 D.P.R. 26, 36 (1996). Por tanto, los tribunales apelativos no debemos alterar determinaciones de hechos que carezcan de base en la prueba que se desfiló ante el foro sentenciador. *Moreda v. Rosselli*, 150 D.P.R. 473, 478-479 (2000).

Por razón de su contacto directo con la prueba, los tribunales de instancia están en mejor posición que los foros apelativos en cuanto a la valorización de los daños. *Cotto Morales v. Ríos*, 140 D.P.R. 604, 626 (1996). La estimación de daños descansa en el juicio discrecional, sereno, prudente y razonable del juzgador de instancia. *Rosado v. Supermercado Mr. Special*, 139 D.P.R. 946, 954 (1996).

Los tribunales apelativos no deben intervenir con las compensaciones concedidas por los tribunales de instancia a menos que éstas sean ridículamente bajas o exageradamente altas. *Nieves Cruz v. U.P.R.*, 151 D.P.R. 150, 170 (2000). Le corresponde a la parte que sostiene la necesidad de modificar las sumas concedidas el demostrar que las circunstancias así lo ameritan. *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443, 451-452 (1994).

## 2. Las servidumbres de aguas

El establecimiento, extensión, forma y condiciones de las servidumbres de aguas se rigen por la ley especial de la materia en cuanto no se halle previsto en las disposiciones pertinentes del Código Civil. Art. 499 del Código Civil, 31 L.P.R.A. sec. 1722.

Los predios inferiores están sujetos a recibir las aguas que naturalmente y sin obra del hombre descienden o fluyen de los superiores, así como la tierra o piedra que arrastran en su curso. Art. 488 del Código Civil, 31 L.P.R.A. sec. 1711, y el Art. 69 de la Ley de Aguas, 12 L.P.R.A. sec. 701. El dueño de un predio inferior sólo está sujeto a recibir las aguas que naturalmente y sin obra del hombre fluyan del predio superior. *Martínez Rivera v. P. R. Coconut Industries*, 68 D.P.R. 243, 247 (1948).

El Art. 488 del Código Civil, *supra*, establece una servidumbre natural que nace de la situación de los predios. *Ramos v. Quiñones*, 55 D.P.R. 924, 926 (1940). Cuando esa situación original varía mediante la construcción de casas, garajes, pavimentos y muros, el predio inferior no viene obligado a recibir las aguas de lluvia que caigan en el superior. *Ramos v. Quiñones*, *supra*, a la pág. 927.

Ni el dueño del predio inferior puede hacer obras que impidan esa servidumbre natural de aguas, ni el propietario del superior obras que la agraven. Art. 488 del Código Civil, *supra*. Cuando el dueño del predio superior realiza obras que altera la naturaleza de las aguas y la situación varía, pierde su aplicación el Art. 488 del Código Civil, *supra*. *González v. Calderón*, 51 D.P.R. 152, 157 (1937). No constituye una agravación de la servidumbre de agua aquel acto del dueño del predio superior que no aumenta el caudal de las aguas recibidas por el predio inferior. *Reyes v. Hernández*, 98 D.P.R. 484, 487 (1970).

En un análisis del Art. 522 del Código Civil Español, cuya disposición es idéntica a nuestro Art. 488 del Código Civil, *supra*, el tratadista José María Manresa y Navarro señala lo siguiente, a saber:

*"Principio general.- Según el texto expreso del Código, en su artículo 552, se habla de las aguas que naturalmente y sin obra del hombre descienden de los predios superiores a los inferiores; la condición fundamental es que las aguas desciendan por sí de un modo natural, de predio a predio, lo cual implica que el agua surja o caiga naturalmente por los fundos. Infiérase de aquí que la servidumbre se establece para todas las aguas que reúnan las condiciones, sean aguas procedentes de las lluvias, y que por sí mismas se deslizan o arrollan, sean procedentes de fuentes naturales, de filtraciones y deshielos; con lo cual quedan excluidas todas las aguas alumbradas intencionalmente, o intencionalmente recogidas."*

Véase, J. M. Manresa y Navarro, *Comentarios al Código Civil Español*, 7ma ed., Madrid, Ed. Reus, 1972, T. IV, pág. 861.

El fundo inferior tiene el deber de recibir las aguas que a él fluyen de todos los predios superiores, de un modo natural y en virtud de la inclinación de los terrenos. Manresa y Navarro, *op. cit.*, pág. 864.

Por otro lado, el dueño del predio inferior o sirviente tiene derecho a hacer dentro de él ribazos, malecones o paredes que no impidan el curso de las aguas y sirvan para regularlas o aprovecharlas. Art. 71 de la Ley de Aguas, 12 L.P.R.A. sec. 703. Del mismo modo, el dueño del predio superior puede construir dentro de él ribazos, malecones o paredes que sin gravar la servidumbre del predio inferior suavicen las corrientes de las aguas e impidan que arrastren consigo tierra vegetal o que causen desperfectos en la finca. Art. 72 de la Ley de Aguas, 12 L.P.R.A. sec. 704.

Manresa y Navarro analiza la interrogante de si el dueño del predio sirviente tiene el deber de cuidar los fosos o caídas de las aguas destinadas a recibir del predio superior para impedir un daño en éste y expone:

*"Naturalmente, si la interrupción fuese obra suya, desde luego está obligado a limpiar de obstáculos los conductos naturales; pero no así en otro caso, porque la esencia de esta servidumbre está más en tolerar que en hacer. Sin embargo, es preciso tener siempre en cuenta lo que dispone el artículo 74 de la Ley de Aguas, según el cual, "cuando el agua acumula en un predio piedra, broza u otros objetos, que, embarazando su curso natural, pueden producir embalse, con inundaciones, distracción de las aguas u otros daños, los interesados podrán exigir del dueño que remueva el estorbo o les permita removerlo. Si hubiera lugar a indemnización de daños, será a cargo del causante". (Énfasis nuestro)."* Véase, Manresa y Navarro, *op. cit.*, pág. 866.

Son de particular relevancia las expresiones del tratadista Manresa y Navarro porque en Puerto Rico existe una disposición idéntica a la anteriormente transcrita que se encuentra comprendida en el Art. 74 de la Ley de Aguas, 12 L.P.R.A. sec. 706 y reza así:

*"Cuando el agua acumule en un predio piedra, broza u otros objetos que embarazando su curso natural puedan producir embalse con inundaciones, distracción de las aguas u otros daños, los interesados podrán exigir del dueño que remueva el estorbo o les permita removerlo. Si hubiera lugar a indemnización de daños, será a cargo del causante."*

## 3. La medianería

La medianería sólo existe cuando dos fincas contiguas están separadas por un elemento común. J. R. Vélez Torres, *Curso de Derecho Civil: Los Bienes y los Derechos Reales,* Offirgraf, S.A., Madrid, 1983, T. II, pág. 209. Además de existir la obra divisoria, es necesario que ésta no pertenezca a uno sólo de los colindantes, pues se trataría de una pared, valla, seto, o zanjas propias por no existir el elemento de separación de la cosa común. Vélez Torres, *op. cit.* pág. 210.

La medianería se puede constituir por un acto de voluntad, es decir, el acuerdo o convenio de los colindante o la decisión unilateral de uno de ellos si media la aceptación o conformidad del otro. J. Castán Tobeñas, *Derecho Civil Español, Común y Foral,* 15ta ed., Madrid, Ed. Reus, 1994, T. 2, Vol. II, pág. 221. La pared medianera no se puede considerar como una propiedad dividida y determinada de cada uno de los colindantes, sino que se trata de una propiedad común, como una comunidad de bienes de naturaleza indivisible, en la que cada condueño adquiere el dominio en proporción a su participación. *Monclova v. Blanco,* 40 D.P.R. 305, 309-310 (1929).

Se presume la servidumbre de medianería mientras no haya un signo o título exterior o prueba en contrario en las siguientes circunstancias: (1) paredes divisorias de los edificios contiguos hasta el punto común de elevación; (2) paredes divisorias de los jardines o corrales sitos en poblado o en el campo; (3) cercas, vallados y setos vivos que dividen los predios rústicos, y (4) en las zanjas o acequias abiertas entre heredades colindantes. Arts. 508 y 510 del Código Civil, 31 L.P.R.A. 1752 y 1754.

Se entiende que hay un signo exterior contrario a la servidumbre de medianería cuando: (1) en las paredes divisorias de los edificios hay ventanas o huecos abiertos; (2) la pared divisoria está por un lado recta y a plomo en todo su paramento, y por el otro, lo mismo en la parte superior, teniendo en la inferior relex o retallos; (3) resulte construida toda la pared sobre el terreno de una de las fincas, y no por mitad entre las dos contiguas; (4) sufra las cargas de carreras, pisos y armaduras de una de las fincas y no de la contigua; (5) la pared divisoria entre patios, jardines y heredades está construida de modo que la albardilla vierte hacia una de las propiedades; (6) la pared divisoria, construida de mampostería, presenta piedras llamadas pasaderas, que de distancia en distancia salen fuera de la superficie sólo por un lado y no por el otro; (7) las heredades contiguas a otras defendidas por vallados o setos vivos no están cerradas. Art. 509 del Código Civil, 31 L.P.R.A. 1753.

La reparación y construcción de las paredes medianeras y el mantenimiento de los vallados, setos vivos, zanjas y acequias medianeros, será a costa de los dueños de las fincas que tienen a su favor la medianería, excepto que se pueden dispensar de contribuir a esa carga renunciando a la medianería. Art. 511 del Código Civil, 31 L.P.R.A. 1755.

## III

En esencia, en su primer y segundo señalamiento de error, los Alvarado-Muñoz entienden que erró el T.P.I. al imponerles responsabilidad por la acumulación de las aguas y los daños ocurridos en la verja construida. Más aún, aducen que erró el tribunal al resolver que los Rodríguez-Evans, como sucesores en título de quien construyó la verja, deben responder por su colapso. Examinados los autos, concluimos que no les asiste la razón.

Por espacio de dos décadas, la verja no presentó problemas mayores para las partes y funcionó sin complicaciones. La referida verja fue construida por el Sr. Charlie Jiménez, un propietario anterior de la residencia de los Rodríguez-Evans, aproximadamente veinte (20) años antes del derrumbe de la misma. Los

Alvarado-Muñoz prestaron su anuencia para la construcción de la verja ubicada en la colindancia de su solar y el de los Rodríguez-Evans. (Véase, Transcripciones del Juicio en su Fondo, pág. 410). Dicha estructura beneficiaba a ambos vecinos por el sentido de privacidad que les proporcionaba. (Véase, Transcripciones del Juicio en su Fondo, págs. 441, 442).

Al aceptar la construcción de la verja, el entendido entre las partes fue que cada cual daría mantenimiento a los desagües ubicados en sus respectivas propiedades. (Véase, Transcripciones del Juicio en su Fondo, pág. 410). El compromiso de los Alvarado-Muñoz sobre el mantenimiento de los desagües se basó en un acuerdo sobreentendido y en la conveniencia de no tener su terreno inundado. (Véase, Transcripciones del Juicio en su Fondo, pág. 411).

Sobre el colapso de la verja no existe controversia en que la causa lo fue la presión que sobre ella ejerció el agua acumulada en el predio de los Alvarado-Muñoz. La controversia gira en torno a las causas para la acumulación del agua en ese lugar. El T.P.I. concluyó que los Rodríguez-Evans evidenciaron que la acumulación de agua en el patio de los Alvarado-Muñoz se debió a la falta de mantenimiento que éstos dieron a los desagües y la obstrucción en los desagües provocada por un proceso de sedimentación que los tapó e inutilizó.

Los Alvarado-Muñoz alegaron que el agua acumulada detrás de la verja se debió a que los desagües estaban tapados en el lado de los Rodríguez-Evans por un material resistente, similar al concreto o cemento.

El Tribunal de Instancia evaluó la prueba, dirimió la credibilidad y concluyó que a los Alvarado-Muñoz le correspondía el cuidado y mantenimiento de las entradas de los desagües y los Rodríguez-Evans eran responsables de los salideros de aquéllos. (Véase, Sentencia apelada, Apéndice IX, pág. 97).

El Tribunal determinó que la principal causa del colapso de la verja medianera fue la negligencia de los Alvarado-Muñoz que consistió en no darle el mantenimiento adecuado desde su propiedad a la entrada de los desagües. (Véase, Sentencia apelada, Apéndice IX, pág. 102). La adjudicación estuvo basada en la credibilidad que le mereció la prueba presentada por las partes y, en particular, el testimonio del Dr. Gregorio Hernández Concepción, ingeniero civil y perito en suelos y estructuras según cualificado por las partes. ■

Los desagües funcionaron por espacio de veinte (20) años. El Dr. Hernández Concepción concluyó que la falta de mantenimiento y la acumulación de sedimento a través del tiempo afectaron la funcionalidad de los desagües y provocaron su obstrucción total. (Véase, Transcripciones del Juicio en su Fondo, pág. 196). Dicha obstrucción tuvo lugar cuando el nivel de sedimentación llegó hasta los tubos del desagüe. (Véase, Transcripciones del Juicio en su Fondo, pág. 327). El Tribunal de Instancia consideró que un mantenimiento adecuado hubiera evitado todo el problema. (Véase, Transcripciones del Juicio en su Fondo, pág. 199).

En su último señalamiento, los Alvarado-Muñoz argumentan que erró el Tribunal en sus conclusiones de hechos por no estar basadas en prueba directa, ser inconsistente con hechos admitidos, estipulados o aceptados y por descartar sin fundamento la prueba directa única, presentada por ellos, y hacer conclusiones basadas en especulaciones. No tienen razón.

Surge de la sentencia apelada un sinnúmero de hechos incontrovertidos y aceptados por las partes que, a manera de ejemplo, mencionamos a continuación. Un período de lluvias por varios días fue la antesala del incidente ocurrido el 25 de noviembre de 1999 y resultó en la acumulación paulatina de aguas en el patio de los Alvarado-Muñoz. El peso del agua acumulada sobre la verja provocó su colapso. La acumulación sustancial de agua tuvo lugar en el solar de los Alvarado-Muñoz, justo detrás de la verja de bloques de hormigón y cemento que tenía unos ocho (8) pies de altura y ciento ochenta y cinco (185) pies de longitud. Los Rodríguez-Evans no podían ver el agua acumulada en el patio de los Alvarado-Muñoz. Éstos podían observar el cúmulo de agua de

unos cuatro pies de altura y no previnieron a sus vecinos Rodríguez-Evans ni corrigieron el problema.

El Tribunal concluyó que la verja que dividía las propiedades contaba con varios desagües en material PVC de aproximadamente cuatro (4) pulgadas de diámetro. Los desagües estaban ubicados en la parte baja de la verja, y como el sedimento los tapó, se acumuló el agua.

No está en controversia que la causa del derrumbe de la verja lo fue la presión que ejerció el agua acumulada en la propiedad de los Alvarado-Muñoz.

El Tribunal de Instancia concedió credibilidad al testimonio del Dr. Hernández Concepción, perito de los Rodríguez-Evans. El récord incluye abundante prueba en apoyo de tal conclusión y no vemos razón para descartarla. Del estudio de los autos no encontramos indicios de pasión, prejuicio, parcialidad o error manifiesto que nos convenzan de que debemos intervenir con las determinaciones de hechos del Tribunal de Instancia. Las conclusiones de hechos corresponden al balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida. No procede la sustitución del criterio de instancia por el de este foro apelativo.

El perito, doctor Hernández Concepción, no encontró evidencia alguna que señalara que los tubos del desagüe estuvieran obstruidos del lado de la propiedad de los Rodríguez-Evans. (Véase, Transcripciones del Juicio en su Fondo, págs. 153, 170, 199, 206, 308-309 y 349). Además, en su evaluación, no encontró indicios de que los tubos de desagüe hubiesen sido obstruidos intencionalmente. (Véase, Transcripciones del Juicio en su Fondo, pág. 170).

El Dr. Hernández Concepción tuvo la oportunidad de explorar diversos escenarios que intentaban explicar la obstrucción de los tubos de desagües. Por ejemplo, el hecho de que éstos contaban con una inclinación constante de un extremo a otro hacía altamente improbable la posibilidad de que se acumulara material en un punto intermedio. (Véase, Transcripciones del Juicio en su Fondo, págs. 175-176). Además, ante la premisa de que todos los desagües se obstruyan al mismo tiempo, señaló que lo más probable es que ocurra un proceso progresivo en el cual primero se obstruye uno, existe una gran cantidad de agua y escorrentía, eventualmente se van tapando los tubos que quedan y se provoca la acumulación del agua que causó el colapso. (Véase, Transcripciones del Juicio en su Fondo, págs. 176-177).

El Dr. Hernández Concepción explicó que la verja que colapsó no fue construida con refuerzos que permitieran la resistencia a cargas o presiones laterales y, a su vez, que la existencia de una pendiente y una especie de hondonada podía causar la acumulación de agua detrás de la misma. Añadió que al estar las entradas de los desagües obstruidas por la sedimentación, se propició una gran acumulación de agua de forma continua. Por tanto, para evitar el colapso, era necesario mantener limpias las entradas de los desagües. (Véase, Transcripciones del Juicio en su Fondo, págs. 181-183).

La apreciación de la prueba realizada por el Tribunal de Primera Instancia encuentra apoyo en la evidencia desfilada. La opinión pericial que hemos descrito está fundamentada en estudios y evaluaciones realizadas por un profesional altamente cualificado. Su opinión pericial fue motivo de preguntas y contrainterrogatorio y su valor probatorio fue debidamente aquilatado. Luego de evaluar el expediente y la transcripción del testimonio, no vemos justificación para cambiarlo.

Al preguntársele a la Sra. Muñoz Holding cuántos días antes de la fecha del incidente comenzó a llover en su propiedad, ésta señaló que *"en el área de Beverly Hills llueve casi todos los días."* (Véase, Transcripciones del Juicio en su Fondo, pág. 428). No está en controversia el hecho de que, unos días antes de que se desplomara la verja, el agua comenzó a empozarse en la propiedad de la familia Alvarado-Muñoz, por lo cual el Sr. Juan (Wiso) Ríos Delgado y el Sr. Darren Ryan Oppenheimer trataron de resolver la situación. Los Alvarado-Muñoz intentaron destapar la entrada de los desagües que están en su propiedad utilizando un

implemento de plomería conocido como una "*culebra*", una cinta de destape y una varilla. (Véase, Apéndice IX, pág. 86, apelantes). No obstante, sus esfuerzos fueron infructuosos. Según la Sra. Carmen Muñoz Holding, su yerno, el Sr. Ryan Oppenheimer, le advirtió que el área del incidente estaba "*muy tapada*" por lo que alega llamaron a la casa de los Rodríguez-Evans sin poder lograr la comunicación. (Véase, Transcripciones del Juicio en su Fondo, pág. 393). Los Rodríguez-Evans no encontraron mensaje en la grabadora de su teléfono. Además, era la casa del vecino inmediato; ¿porqué no acudir a informarle personalmente?

Los Alvarado-Muñoz reconocieron su compromiso de brindar mantenimiento al lado de la verja que quedaba en su propiedad y estaban conscientes de que el agua se estaba estancando. A pesar de tratar de resolver el problema, sus esfuerzos no fueron efectivos y resultaron insuficientes. Tampoco le advirtieron a los Rodríguez-Evans de la situación de peligro.

El Tribunal de Instancia concluyó que los Alvarado-Muñoz incurrieron en negligencia en el mantenimiento de la verja y en la solución del problema de acumulación de aguas que provocó el colapso de la verja. La conclusión de negligencia encuentra amplio apoyo en la evidencia desfilada en el juicio.

De los autos no surge razón que justifique dejar sin efecto las determinaciones de hechos del T.P.I. ni que se modifiquen sus conclusiones de derecho. No se cometieron los errores señalados por los apelantes.

## IV
Por los fundamentos expuestos, se confirma la sentencia apelada.

Así lo pronunció y manda el Tribunal y lo certifica la Secretaria.

Lcda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones