Morales Rodríguez, Juez Ponente
*990 TEXTO COMPLETO DE LA SENTENCIA
Doña María Cristina Herrera Bolívar y su esposo don Andrés Rivera Llopiz, por sí mismos y en representación de su hijo menor Gabriel Alberto Rivera Herrera, incoaron una demanda contra el doctor Efraín Ramírez Torres, su esposa Julie Vicens Salgado y la sociedad legal de gananciales por ellos compuesta. Alegaron que el doctor Ramírez estuvo a cargo del alumbramiento de Gabriel Alberto; que utilizó fuerza excesiva para flexionar lateralmente y halar la cabeza del bebé; que la actuación negligente del obstetra le causó al menor una parálisis de su extremidad superior izquierda con lesiones sustanciales permanentes.
El doctor Ramírez alegó que atendió a su paciente dentro de las más altas exigencias de la mejor práctica de la medicina moderna. Argüyó que a los médicos se les reconoce una amplia discreción al formular su juicio profesional en cuanto al diagnóstico y tratamiento de un paciente; que sus actuaciones constituyeron un error de juicio honesto y razonable.
El pleito se bifurcó para dilucidar primero lo relativo a la responsabilidad del médico. Se celebró el juicio. Luego de evaluada la prueba presentada, la jueza de primera instancia dictó sentencia parcial. Hizo las siguientes determinaciones de hechos que debemos citar en toda su extensión:

“1. María Cristina había tenido su primer bebé en el año 1989 por vía vaginal con un peso de 6 libras sin complicaciones.

2. María Cristina tenía 28 años para si( segundo parto en 1994. Recibió cuidado prenatal con los doctores Ramírez Torres y Rivera Cubano. Durante el embarazo, María Cristina aumentó de 231 libras y media a 267 libras.

3. El 13 de mayo de 1994 a las 9:24 a.m., María Cristina fue admitida al Ashford Presbyterian Community Hospital con síntomas de parto.

4. En la sala de parto se encontraba María Cristina, su monitriz, señora Leonor Ortiz Vélez, el Dr. Ramírez Torres, la enfermera Linda Morales y el esposo de María Cristina, señor Andrés Rivera Llopiz.

5. Antes de comenzar el parto, María Cristina fue colocada en la posición “Me Roberts”, es decir, con las piernas abiertas, y los pies montados en los estribos de la cama de parto.

6. Con el pujo materno, el bebé sacó la cabeza espontáneamente. El obstetra le requirió a María Cristina que siguiera pujando. Mientras ella pujaba, el doctor hizo con sus manos una fuerte tracción de la cabeza fetal. Al no salir el resto del bebé, el obstetra hizo una proctoepisiotomía. Luego hizo presión suprapúbica sin asistencia de la enfermera. No logró que la criatura naciera. El hombro del bebé estaba impactado.

7. El doctor Ramírez le requirió a María Cristina que siguiera pujando. Mientras ella pujaba, él hizo otra tracción de la cabeza del bebé. Esta vez fue lateral y hacia abajo. La tracción fue tan fuerte que el esposo de *991 María Cristina, Andrés Rivera, expresó que “en un momento yo pensé que se iba a quedar con la cabeza en la mano porque estaba halando tan duro ”.

8. La tracción adicional, innecesaria y excesiva, tampoco logró la salida del cuerpo del bebé. El doctor le indicó a la enfermera, Linda Morales, que hiciera presión fundal.

9. El obstetra realizó la maniobra de “Woods” para desimpactar el hombro del bebé. Así se logró que el niño naciera.

10. El Dr. Ramírez le mostró el bebé a los padres. Inmediatamente después, les dijo que le había tenido que fracturar la clavícula para que pudiera nacer, les informó que lo iba a enviar a Rayos X para que le tomaran placas y así ver lo que tenía.

11. Del expediente del hospital, surge que el parto fue uno traumático. El bebé nació con el brazo izquierdo paralizado y flácido, con un hematoma en la parte anterior izquierda del pecho y con una laceración en los dedos del pie izquierdo.

12. Gabriel sufrió una lesión al plexo braquial que resultó en una parálisis de “Erb” y una parálisis de “Klumpke ”. Las lesiones al plexo braquial son causadas por estiramiento forzado o excesivo. Cuando son severas y hay rompimiento de nervios, como fue en este caso, la parálisis resultante es permanente. ”

En lo pertinente, concluyó el tribunal que:

“1. El halar la cabeza fetal del bebé fuerte y excesivamente ocasionó la severa lesión que tiene Gabriel en el plexo braquial.

2. Hubo una total ruptura del nervio, con toda probabilidad a nivel del cordón espinal.

3. Un brazo flácido, como el que exhibe Gabriel, significa que los músculos del brazo están paralizados e incapaces de ser utilizados.

4. En este caso, eso ocurrió porque los nervios fueron desprendidos de la columna vertebral.

5. Al presente, el brazo del menor se encuentra en la siguiente condición: es más corto y menos desarrollado que el brazo derecho; la mano izquierda se encuentra parcialmente cerrada, con la palma de la mano hacia arriba y el dedo pulgar hacia adentro; sólo puede mover levemente hacia arriba el dedo índice y el del corazón; no puede abrir la mano; puede levantar el brazo hasta el nivel de la cintura, diagonalmente; su movimiento lateral y de bíceps es mínimo; no puede tomar ningún objeto con esa mano ni realizar ninguna actividad con ella.

6. La parálisis de “Erb,s” y de “Klumpke”, según el doctor Marvin Krane, fue ocasionada por el obstetra, al halar o flexionar excesivamente y torcer la cabeza del bebé cuando trató de resolver la distocia del hombro y completar el parto del infante.

7. No hay factores que indiquen que el plexo braquial de Gabriel fuese lesionado en cualquier otro momento.

8. Para el año 1994, las maniobras efectuadas por el obstetra eran aceptables. Pero halar o flexionar excesivamente la cabeza del bebé, no lo era.

9. La lesión braquial sólo puede ser causada por flexión lateral excesiva halando o torciendo la cabeza del 
*992
bebé.

10. Puede ocurrir daño al plexo braquial si existen condiciones en el bebé que se descubren posterior al nacimiento. Por ejemplo, daños de nervios congénitos, problemas cerebrales, tumores en la tiroide o en el cuello en el músculo esternocleidomastoide, el cual queda cortado genéticamente.

11. Gabriel no tenía ninguna de estas condiciones.

12. En el año 1994, de acuerdo con el Dr. Krane, estaba indicado hacer presión suprapúbica. Sin embargo, halar, flexionar la cabeza fetal, no debió hacerse hasta después de desimpactar los hombros. La flexión y tracción lateral de la cabeza fetal, una vez impactado el hombro, no está recomendada en forma alguna. De hecho, debe evitarse totalmente.

13. El Dr. Krane concluye que la lesión al plexo braquial no es secundaria a la impactación del hombro del bebé contra la sínfisis púbica, ya que las fuerzas durante el parto nunca pueden generar las fuerzas que se requieren para producir esta lesión. Estas lesiones sólo pueden ser ocasionadas deforma iatrogénica, es decir por el médico obstetra. Para poder ocasionar esta lesión al plexo braquial, se requiere una fuerza de 3 a 4 veces mayor que las fuerzas normales del parto y solamente pueden ser producidas por alguien ejerciendo presión en la cabeza del bebé. El pujo materno no puede ocasionar lesión al plexo braquial. La mujer no puede retener la respiración y empujar con suficiente fuerza para extender y estirar los nervios hasta el grado que sean lesionados. Se requiere una fuerza externa, en específico, la fuerza del obstetra utilizando la cabeza fetal halándola con fuerza excesiva.

14. No debe hacerse tracción de la cabeza fetal mientras el hombro está impactado, como se hizo en este caso. Aún después de haber hecho la proctoepisiotomía, el Dr. Ramírez continuó haciendo tracción de la cabeza fetal, conjuntamente con el pujo materno y la presión fundal. Si se hala la cabeza del bebé antes que la obstrucción sea liberada, es imposible “dar parto” (sic) al bebé y se le ocasiona más daño.

15. El Dr. O’Leary entiende que causas intrauterinas de una lesión al plexo braquial son condiciones sumamente raras y crónicas. Un ejemplo de esto, es una madre con doble útero, una mamá cuyo bebé esté en una posición persistente transversal u horizontal, así como tumores y quistes en el cuello.

16. De los expedientes médicos del caso no hay evidencia que demuestre que María Cristina tuviera un doble útero o que el feto estuviera en una posición transversa ni que tuviera tumores en el cuello.

17. El Dr. O’Leary no encontró causa intrauterina alguna para lesión al plexo braquial del bebé en este caso.

18. El progreso del parto no evidencia una etiología intrauterina de lesión al plexo braquial. La dilatación y el descenso del bebé fueron normales.

19. En este caso, las fuerzas intrauterinas no son ni fueron suficientes para lesionar el plexo braquial.

20. Según el Dr. O’Leary, en este caso, la lesión que padece el menor en el plexo braquial no es secundaria a la impactación del hombro del bebé contra la sínfisis púbica. Si hubiese habido impactación severa, habría lesión tanto a la madre como al bebé. Las lesiones al bebé serían moretones, inflamación y músculos dañados. La madre sufriría las mismas lesiones. Estos moretones, de haber habido una impactación severa, tenían que estar localizados sobre el hombro del bebé, lo cual no ocurrió en este caso.

21. En los expedientes médicos examinados y sometidos en evidencia no hay documento alguno que pruebe que el bebé tuviera lesiones en los hombros o que se hubiesen documentado lesiones en la madre.

*993 22. De haber habido impactación severa, la madre tendría daño a su vejiga, a su útero y laceraciones vaginales, lo cual no ocurrió en este caso.

23. La lesión al plexo braquial de Gabriel ocurrió porque hubo un estiramiento excesivo. Esta es severa.

24. Para el año 1994, la práctica médica aceptable y reconocida al enfrentarse a un caso de distocia de hombro era nunca utilizar tracción fuerte.

25. La maniobra “Me Roberts” es una maniobra pasiva en la que los muslos de la paciente son flexionados fuertemente sobre su abdomen, con el propósito de hacer que la parte anterior al hombro impactado caiga por debajo de la sínfisis púbica para que se permita que el bebé pueda nacer. De acuerdo con “Williams’ Obstetrics”, esta maniobra requiere la asistencia de dos personas, de suerte que cada asistente pueda agarrar cada una de las piernas de la paciente y flexionarle fuerte contra su abdomen.

26. En este caso, la paciente solamente fue puesta en la posición de “Me Roberts”. Así consta del expediente médico y Nota de Parto. No se efectuó, de hecho, flexión fuerte de los muslos contra el abdomen de la paciente. Esto constituye una desviación del cuidado médico debido, según la mejor práctica de la medicina en el año 1994.

27. Presión suprapúbica es aquélla que se hace sobre la pubis, en el abdomen de la madre, y se hace con el propósito de empujar el hombro del bebé por detrás de la sínfisis púbica. Esta maniobra tiene el propósito de empujar el hombro detrás de la sínfisis púbica para permitir la salida del resto del bebé. Esta maniobra, de acuerdo a Williams’ Obstetrics, requiere un asistente mientras el obstetra hace tracción normal de la cabeza fetal. En este caso, el obstetra hizo presión suprapúbica, él mismo, sin asistencia alguna de la enfermera. Esto constituye también una desviación del cuidado médico debido, según la mejor práctica de la medicina en el año 1994.

28. Presión fundal es la presión que se ejerce al fondo del útero para ayudar al parto del bebé. En casos de distocia de hombro, no es recomendable hacer presión fundal, ya que esto empeora la presión del hombro sobre la matriz y puede lesionarse el plexo braquial. En este caso, la enfermera Linda Morales, a instancias del Dr. Ramírez, hizo presión fundal mientras el obstetra hacía tracción de la cabeza fetal. Esto constituye una desviación del cuidado médico debido, según la mejor práctica de la medicina en el año de 1994.

29. El obstetra en este caso, según el Dr. O’Leary, se desvió de las normas de cuidado aceptables en el tratamiento de una distocia de hombro al aplicar una tracción excesiva y forzosa a la cabeza del infante, que ocasionó las severas lesiones que padece el menor

30. Las lesiones sufridas por Gabriel se originaron durante el parto. La presión suprapúbica y halar excesivamente la cabeza del bebé, produjeron los daños que tiene el menor en este caso.

31. Los doctores Caraballo y Álvarez coincidieron en que Gabriel tiene una parálisis braquial del brazo izquierdo que envuelve tanto las regiones superiores como inferiores con un movimiento a nivel paracervical con prácticamente ningún movimiento en el nivel inferior. La ausencia de movimiento conlleva la prognosis extremadamente pobre para una recuperación neurológica completa. Lo que indica que en este caso hubo una ruptura completa del nervio, con toda probabilidad a nivel del cordón espinal.

32. El obstetra en este caso se desvió de las buenas, acertadas y aceptadas prácticas médicas al ejercer presión y al haber halado lateralmente y hacia debajo de forma excesiva la cabeza del bebé durante el parto. Estas desviaciones ocasionaron que el infante sufriera lesión severa al plexo braquial izquierdo y ruptura del nervio, dando como resultado que el menor padezca de una parálisis de “Erb’s” y una parálisis de “Klumpke”, 
*994
permanentes.

33. Las opiniones vertidas por los doctores Krane y O’Leary nos merecieron entera credibilidad. ’’

La sentencia parcial adjudicó la negligencia y relación causal. El doctor Ramírez apeló ante este Tribunal. Un panel hermano confirmó. El médico elevó un recurso de Certiorari ante el Tribunal Supremo. La petición fue declarada sin lugar. La sentencia parcial advino final y firme. Entonces se celebró la vista para determinar daños. La parte demandante sometió prueba testifical y pericial. El doctor Ramírez no presentó prueba testifical ni prueba pericial en esta etapa. La jueza de primera instancia, luego de aquilatar y evaluar la prueba que tuvo ante su consideración, emitió la sentencia impugnada. Hizo las siguientes determinaciones de hechos:

“1. Gabriel A. Rivera Herrera nació en San Juan, Puerto Rico, el 13 de mayo de 1994. Es el segundo de tres hijos procreados en el matrimonio de María Cristina Herrera y Andrés Rivera Llopiz. Reside con sus padres en el Estado de la Florida, lugar donde mudaron su residencia con el propósito de gestionar y conseguir mejores servicios médicos para Gabriel. Al conocerlo en ocasión de celebrarse la vista de daños, nos captó la atención lo alerta de su carácter combinado con una sobriedad y madurez atípica en un varón de su edad que ha estado expuesto a sinsabores y experiencias que no ocurren de ordinario a los niños en esa etapa de sus vidas.

2. Más aún, a simple vista resalta una profunda y triste mirada en su rostro y en un tenso momento que se suscitó en Sala cuando lloró, sin consuelo, tuvimos un cercano encuentro con la desolación que vive ante su desafortunado defecto físico. Como veremos más adelante, permanece definitivamente deprimido; dicho de otro modo, respira infelicidad.

3. A Gabriel lo pudimos describir como un tipo bien parecido físicamente. Es guapo, aunque está sobrepeso. Enfatizamos en ello, con el propósito de destacar la realidad inequívoca de que su condición en el brazo es patéticamente visible y la limitación física contrasta con el resto de su perfil y apariencia.

4. A consecuencia de la impericia médica profesional del doctor Efraín Ramírez Torres, Gabriel nació con el brazo izquierdo paralizado yflácido, un hematoma en la parte anterior izquierda de pecho y una laceración en uno de los dedos del pie izquierdo.

5. Durante el parto, el bebé sufrió una lesión al plexo braquial izquierdo que resultó en una parálisis de “Erb ” y una parálisis de “Klumpke”. La severa lesión al plexo braquial fue causada en el momento del parto porque en el esfuerzo del doctor Ramírez de liberar los hombros del bebé, haló excesivamente la cabeza ocasionando que se rompieran y estiraran los nervios del plexo braquial. (...)

6. El doctor Néstor Cardona Cando, luego de evaluar al menor y de examinar los récords médicos, determinó por escrito y luego explicó y profundizó en Corte Abierta que Gabriel tiene un (99%) noventa y nueve por ciento de impedimento que se traduce a un (59%) cincuenta y nueve por ciento de impedimento de la totalidad de sus funciones generales.
7. Ninguno de los hermanos de Gabriel tiene deformidades o limitaciones físicas. Su hermano mayor, Andrés, tiene diecisiete años de edad, no tiene limitaciones físicas y está saludable. Del mismo modo, su hermana menor tiene nueve años y no tiene deformidades.

8. El 4 de junio de 1996, Gabriel fue intervenido quirúrgicamente en Florida Hand Center. En dicha institución hospitalaria le practicaron un reemplazo de tendón, con el propósito de aliviar algunas molestias en el brazo.

9. Fue operado nuevamente en octubre y noviembre de 2001.

*995
10. En la audiencia judicial, la madre María Cristina Herrera testificó extensamente sobre las dificultades que ha confrontado su familia con la condición que presenta Gabriel física y emocionalmente.

11. Traslucieron en la audiencia judicial todas las limitaciones físicas que posee y poseerá Gabriel por el resto de su vida. Es tan limitante su condición que la prueba no contradicha consistente en el testimonio del perito doctor Néstor Cardona estableció que como Gabriel no tiene movilidad activa del hombro, ni rotación del manguillo rotador, el brazo se le queda literalmente colgando, el hombro izquierdo está más bajo que el derecho, tiene el codo doblado todo el tiempo y la extremidad subdesarrollada por la falta de conexión.

12. Ya que la parte demandada no ofreció prueba pericial alguna, hemos determinado incorporar a la presente sentencia los informes periciales de los doctores Néstor Cardona Cando y la psiquiatra Daría Fernández Demorizi; que describen en detalle la condición física y emocional de Gabriel. Ambos inequívocamente coinciden sin temor a equivocamos con nuestra apreciación del caso. En ambos informes periciales se especifican el alcance de las limitaciones de Gabriel y el panorama luce desolador. Es un hecho inequívoco que Gabriel, en el presente y en el futuro, requiere y necesita soporte profesional, apoyo emocional para aceptarse. Además de ayuda y recursos económicos para prepararse y valerse en la medida de lo posible, por sí mismo.

13. Debo añadir que en la audiencia judicial, al escuchar a Gabriel declarar, advertimos su inseguridad y angustia. A Gabriel, ya sus padres le explicaron que una de las recomendaciones del fisiatra sugiere un reemplazo del brazo previa amputación cuando alcance su estatura definitiva.

14. Para una amplia, específica y científica explicación del procedimiento y su costo, el Tribunal incorpora a la presente sentencia el informe pericial del doctor Filí-Melé Rodríguez. (...)

15. No hay duda alguna que la señora madre de Gabriel está muy afectada emocionalmente con la situación de su hijo aunque tiene la fortaleza espiritual que la motiva a no amilanarse y empujarse para estar atenta y en lo posible estar en control de la situación, por Gabriel, su esposo y los otros dos hijos del matrimonio. Es evidente lo difícil y angustioso que es para esta madre su rol diario con su hijo Gabriel que tiene sus períodos en que su hostilidad acentúa, especialmente cuando recibe la burla de otros niños o cuando los adultos se le quedan mirando.

16. En la encuesta judicial, su testimonio fue realmente importante para todos los presentes con naturalidad, aunque estremecida contó de la forma en que estuvo rechazando a su hijo cuando tenía poco tiempo de nacido y el tiempo que estuvo en negación. Más tarde entendió que tenía la obligación de sobreponerse, estar en control y enfrentarse a la situación.

17. La señora María Cristina Herrera asiste a Gabriel todo el tiempo. Lo ayuda a vestirse. Está muy pendiente en darle apoyo a su hijo. Pone especial cuidado en escoger la ropa y calzado que usa Gabriel, de suerte que a éste se le facilite la labor de vestirse sin ayuda.

18. Del mismo modo, el padre de Gabriel presta especial atención a su hijo y a sus necesidades. No debemos olvidar que Gabriel opina de sí mismo que es un manco, ya que no puede agarrar objetos con ambas manos. Conforme surge del testimonio de ambos peritos en la encuesta judicial, su limitación es de tal naturaleza que afecta toda su vida presente y futura.

19. A modo de especificar, en el plano afectivo no puede abrazar, no puede seleccionar un sinfín de profesiones y todo ello incide su psiquis.

20. A tenor con lo ya dicho, repetimos que ya que la negligencia estaba adjudicada en este caso y surgiendo de 
*996
los autos que la póliza no ofrecía cubierta suficiente ($200,000.00) para la magnitud de los daños, intentamos mediar, aún hasta después de celebrada la vista en su fondo. No fue posible lograr un acuerdo económico.

21. Según puede apreciarse, la valoración de los daños en el presente caso, conlleva un alto elemento científico concentrado en el peritaje. La parte demandada no utilizó perito alguno y su participación en el acto del juicio fue mínima, pro forma y el contrainterrogatorio limitado. La prueba de la parte demandante cumplió con creces el criterio de preponderancia.

22. Por tanto, el Tribunal, estando en posición de resolver, adjudica los daños como sigue:

El Tribunal concede por los daños de los sufrimientos y angustias mentales, intervenciones quirúrgicas pasadas y futuras consistentes en la cantidad de un millón quinientos sesenta y nueve mil quinientos dólares ($1,569,500.00) a Gabriel. Con respecto a las intervenciones quirúrgicas futuras, aparte de la prueba pericial que ya hemos incorporado a la presente sentencia de los doctores Néstor Cardona Cando y Daría Fernández, hacemos formar parte de la sentencia el informe de la doctora Filí Melé Rodríguez que recomienda también una prótesis, explica el procedimiento, el costo, duración y reemplazo. (...) El total del costo del brazo y su mantenimiento durante 53 años de vida es de $969,500.00

23. Poco puede añadir, a lo observado en Corte abierta cuando declaró la madre de Gabriel. Su sufrimiento ha sido y es incomesurable. Basta con describir la tortura de esta madre al saber que su hijo no presentaba deformación física durante el parto, que tiene dos criaturas más perfectamente normales y que diariamente tiene que enfrentarse a esa realidad. Vive en una agonía constante, preocupada por su hijo, cuando ella no pueda asistirlo ni emocionalmente ni en su rutina diaria. El Tribunal le concede una indemnización de trescientos cincuenta mil dólares ($350,000.00).

24. Al padre, Andrés Rivera Llopiz, cuyo testimonio fue estipulado, a quien escudriñamos visualmente en la encuesta judicial y percibimos su angustia, su dolor cuando su esposa declaraba, la preocupación por su hijo, lo indemnizamos en la cantidad de doscientos mil dólares ($200,000.00). ”

El Tribunal dictaminó:

“A la luz de lo anterior, el Tribunal dicta sentencia condenando a la parte demandada Efraín Ramírez Torres y Julie Vicens Delgado, y la Sociedad Legal de Gananciales compuesta por ambos a satisfacer la cantidad total de dos millones ciento diecinueve mil quinientos dólares ($2,119,500.00), según desglosada.

Se le impone el pago de costas y la cantidad de cinco mil dólares ($5,000.00) por concepto de honorarios de abogado. El Tribunal declara que dichos demandados actuaron con manifiesta temeridad, máxime cuando la determinación de responsabilidad por negligencia ya tenía finalidad. ”

Inconforme, el doctor Ramírez acude ante nosotros. Le imputa al Tribunal de Primera Instancia haber errado: (1) al determinar que él incurrió en negligencia médica y que existe nexo causal entre sus actuaciones y los daños sufridos por el menor durante su nacimiento; (2) al no aplicar la doctrina de error de juicio; (3) al concederle una cantidad excesiva a los demandados por concepto de los daños sufridos; (4) al aumentar dramáticamente, mediante sentencia Nunc Pro Time, la cuantía de la indemnización concedida a los demandantes; y (5) al condenarlo al pago de honorarios de abogado por entender que fue temerario.
Doña María Cristina y don Andrés presentaron una “Moción Solicitando Desestimación Parcial de Apelación ”. Plantearon que el doctor Ramírez le había solicitado nuevamente a este Tribunal que revisara la Sentencia parcial que adjudicó la negligencia y relación causal; que esa sentencia había advenido final y fírme, después de haberse utilizado el proceso apelativo. Desestimamos los planteamientos que impugnan las *997 determinaciones sobre negligencia y nexo causal. Quedan ante nuestra consideración los últimos tres errores planteados.
1. La valoración de daños
La valoración del daño es, en la misión judicial, una de las más sensitivas y difíciles. “Conceder cuantías insuficientes por concepto de daños sufridos tiene el efecto de menospreciar la responsabilidad civil a la que deben estar sujetas las actuaciones antijurídicas. ” Amadeo Murga, El Valor de los Daños en la Responsabilidad Civil, Tomo I, Editorial Esmaco, 1997, pág. 31. Nuestra jurisprudencia constante establece, también, que una valoración exagerada tiene un efecto punitivo, ajeno a nuestro ordenamiento civil. Los jueces y juezas debemos dar con una proporción razonable entre el daño causado y la indemnización concedida; una que ponga freno, incluso, al clamor de nuestra subjetividad cuando estamos ante hechos que exacerban el ánimo judicial. La función de valorar el daño es más difícil cuando se trata de entuertos no patrimoniales, es decir, daños morales o emocionales. Nieves Cruz v. U.P.R., 151 D.P.R. 150, 170-171 (2000).
En síntesis, aunque la apreciación valorativa de daños no esté exenta de cierto grado de especulación y subjetividad, los jueces y juezas tenemos que aspirar a que nuestra adjudicación sea razonablemente balanceada, es decir, ni extremadamente baja ni desproporcionadamente alta. Blas Toledo v. Hospital Nuestra Sra. de la Guadalupe, 146 D.P.R. 267, 339 (1998). No existe una fórmula que recoja todos los elementos que nutren ese tipo de valoración. No hay tablas mecánicas del dolor físico y mental que permitan obtener un resultado exacto y apropiado. Nieves Cruz v. U.P.R., supra, a la pág. 171. La valoración tiene que responder a los hechos particulares y únicos de cada caso. Por eso, la que se hubiese realizado en un caso específico, no puede ser considerada como precedente obligatorio para otro caso. Toro Aponte v. E.L.A., 142 D.P.R. 464, 478 (1997). La tarea de valorar el daño descansa inicialmente en el ejercicio discrecional prudente, juicioso y razonable del juzgador de hechos, animado por un sentido de justicia y de conciencia humana. S.L.G Rodríguez v. Nationwide, 156 D.P.R. 614, 622 (2002).
Los jueces y las juezas de instancia están en mejor posición que los tribunales apelativos para hacer esa evaluación. Son ellas y ellos los que tienen contacto directo con la prueba presentada en el proceso. Aplica pues, aquí una pauta de abstención judicial. No intervenimos con la estimación y valoración de daños que hacen los tribunales de instancia a menos que las cuantías sean exageradamente bajas o altas. Administrador F.S.E. v. ANR Construction Corp., et ais, resuelto el 23 de septiembre de 2004, 2004 JTS 162, 163 D.P.R._(2004). Cuando se da uno de esos casos excepcionales, podemos revisar la cantidad otorgada porque la norma de abstención no es absoluta. Sanabria v. E.L.A., 132 D.P.R. 769, 772 (1993).
Una parte que solicita la modificación de las sumas concedidas está obligada a demostrar la existencia de circunstancias que lo ameriten. Nieves Cruz v. U.P.R., supra, a la pág. 176. De lo contrario, prevalece la norma de abstención en ausencia de pasión, prejuicio, parcialidad o error manifiesto. Álvarez de Choudens y otros v. Rivera Vázquez, resuelto el 17 de junio de 2005, 2005 JTS 90, 164 D.P.R._(2005).
2. La prueba desfilada
Plantea el doctor Ramírez: (1) que las cuantías otorgadas a Gabriel Alberto, doña María Cristina y don Andrés son exageradamente altas y excesivas; (2) que estos últimos no presentaron prueba alguna para establecer los daños emocionales que reclamaban; (3) que don Andrés no declaró; (4) que la jueza fijó su compensación de acuerdo al comportamiento que él manifestó en sala mientras escuchaba a su esposa declarar; y (4) que esa observación no constituye prueba fehaciente de los daños emocionales que alegadamente sufrió.
Hemos examinado minuciosamente toda la evidencia que se presentó durante la vista. En particular, estudiamos el testimonio de doña María Cristina. Sus declaraciones, contrario a lo que se plantea, constituyen *998 prueba fehaciente de los daños emocionales que ésta sufrió. En lo pertinente, ella testificó:

“P ¿ Cómo usted se sintió al averiguar la condición que tenía el niño, Gabriel.

R ¿ Cómo me voy a sentir?

P Pues explíqueme.

R Bueno, al principio yo rechazaba al nene. Yo no, no lo cogía, yo no lo bañaba. Mi mamá era la que se hizo cargo de él. Yo no aceptaba la condición del nene, porque yo siempre le había pedido a él que me hiciera una cesárea y él nunca me la quiso hacer. Esto ha sido bien duro. Gabriel sufre mucho. El llega a casa muchas veces llorando. El ha tenido millones de problemas. Ha sido un lucha bien grande, una terapias bien fuertes desde los cuatro (4) días de nacido.

(...)

P ¿Y cómo usted se sentía y siente con motivo de, pues, de la situación que usted ha descrito aquí?

R Yo creo que ésta es una de las primeras veces que mi hijo me ve llorar, porque yo nunca lloro al frente de él. Yo lo oigo, lo escucho y, y lo aconsejo, y después me viro, me voy al baño y lloro. Porque a mí no me gusta que él sepa que...Es que yo, a mí me duele, como mamá, verlo a él llorar, a lo que se somete, tener que hablar con los amiguitos y decirles “mira, no se burlen. Ustedes, eso no es nada. Hay otros que...Pues, ustedes a lo mejor hay otras cosas que no pueden hacer con dos (2) manos. ” Pero es fuerte para mí como mamá. Es mi hijo el que está sufriendo, no es más nadie.

(...)

P Okay. ¿ Usted puede describirle al Tribunal cuál es la, la vida funcional de Gabriel? La vida diaria, cotidiana, de Gabriel.

R Bueno, Gabriel yo le pongo los zapatos, a menos de que sean de velero porque...Las medias yo se las pongo siempre. Los zapatos, si hay que amarrárselos, yo se los amarro y sino generalmente él va a la escuela con tenis de velero. Gobi no puede usar correa para la escuela. Si sale conmigo o su papá, entonces sí porque nosotros tenemos acceso a quitársela si él tiene que ir al baño. Ya, gracias a Dios, hemos superado la etapa de lograrle poner la camisa. Ya él se pone la camisa sólo. Este, lavarle la cabeza, se la lavo yo porque él no, no atina a lavarse el otro lado del, del pelo. Así que, yo el lavo la cabeza. Yo lo arrodillo, se la lavo y después entonces él se mete a bañar. Vida, no tiene ninguna, fuera de ir al colegio, llegar a casa, estudiar, ver televisión y jugar Nintendo. (...) Fuera de eso, Gobi no hace más nada.

P ¿En qué forma, si alguna, se ha afectado la vida familiar de ustedes con motivo de esta situación?

R Bueno, se afecta mucho porque él ve cosas que sus hermanos pueden hacer que él no puede hacer. (...)

P Okay, ¿ Cómo ha reaccionado Gabriel a toda esta situación que usted ha descrito aquí?

R Él quiere ser como un niño normal. Él quiere tener su brazo normal. Eso es lo único que él quiere. ”

Los daños sufridos por don Andrés quedaron probados mediante las declaraciones que él vertió en el juicio para establecer negligencia y nexo causal. Las observaciones que hiciera la jueza acerca del dolor manifestado por él mientras escuchaba a su esposa declarar fortalecieron ese testimonio. Don Andrés no testificó en el juicio *999 para determinar la cuantía de los daños, porque el doctor Ramírez estipuló su testimonio. A esos efectos, dijo el licenciado Ramón L. Walker Merino: “Y si el papá va a decir lo mismo que la mamá, también lo estipulamos. ” El doctor Ramírez renunció así a su derecho de influenciar la apreciación que la jueza de primera instancia pudiera hacer sobre los daños que don Andrés sufrió. Es temerario plantear ahora que la cuantía concedida a don Andrés, por sus sufrimientos y angustias mentales, no procede porque durante la vista para determinar los daños no desfiló prueba sobre ese particular. En Moa v. E.L.A., 100 D.P.R. 573, 587 (1972), por voz del Juez Asociado Hernández Matos, concluyó para siempre el Tribunal Supremo:

“Sufrir moralmente el padre por el infortunio del hijo, es, en términos generales, un hábito ordinario de la vida, un proceso psíquico inevitable en todo ser humano normal. Ello es de reconocimiento común y general, notorio e indisputable, que en el nivel de las pruebas, es o debe ser de conocimiento judicial, aún cuando no se ofrezca evidencia alguna al efecto ’ ’.

Gabriel Alberto estuvo presente durante la vista sobre los daños. Comenzó a testificar y, vista su reacción ante el proceso, fue interrumpido por la jueza de primera instancia. Ella explicó que “se afecta muy brutalmente el nene porque vio a la mamá llorando”; pidió a los abogados que se acercaran al estrado. El licenciado Walker, después de la consulta, manifestó que también estipulaba su testimonio. Indicó que era corroborativo.
3. La compensación monetaria a los padres
El Tribunal de Primera Instancia valoró los sufrimientos y angustias mentales de doña María Cristina y don Andrés en $350,000 y $200,000, respectivamente. El doctor Ramírez nos pide que revisemos esta valoración por considerarla exagerada. Propone como parámetro la otorgada en Riley v. Pacheco, 119 D.P.R. 762 (1987). Se ha pautado que es aconsejable que los tribunales utilicen como guía o punto de partida las cuantías concedidas por el Tribunal Supremo en casos similares. Elba ABM v. UPR, 125 D.P.R. 294, 327 (1994).
Para poder utilizar las cuantías otorgadas en casos similares como parámetro en estas revisiones, hay que ajustar primero el cálculo realizado y traerlo a valores presentes. Se toma en cuenta el alza del costo en el nivel de vida y la merma en valor adquisitivo del dólar. Rojas v. Maldonado, 68 D.P.R. 818 (1948). Una vez se ajusta la valorización hecha por el Tribunal Supremo, hay que evaluar las circunstancias particulares del caso. Toro Aponte, supra.
En Riley v. Pacheco, el Tribunal Supremo revisó la cuantía de los daños otorgada a la madre de una menor que sufrió una anoxia cerebral durante el parto. El Tribunal de Primera Instancia le había otorgado $100,000 por los sufrimientos y angustias mentales. El Tribunal Supremo no redujo la cuantía en el año 1987. Hay otro precedente, Merced v. Gobierno de la Capital, 85 D.P.R. 552 (1962), donde el Tribunal Supremo le concedió $3,000 a los padres de un menor —a quien se le tuvo que amputar su brazo izquierdo luego de haber sufrido una caída — por sus sufrimientos y angustias mentales. Esto ocurrió en el año 1962.
Si usamos como parámetro el caso de Riley —$100,000 en el año 1987 ajustados a lo que esa cantidad vale al presente, aproximadamente $335,000 — , concluimos que son poco menos de los $350,000 otorgados como compensación a doña María Cristina. La cantidad otorgada no sería entonces, exageradamente alta. Podemos entender que los $200,000 otorgados a don Andrés responden a su presencia menor en la vida cotidiana de su hijo, como lo justifica la sentencia impugnada.
Ahora bien, si usamos como parámetro el caso de Merced, notamos que su equivalencia en valores presentes es de aproximadamente unos $160,000. La cuantía otorgada a los padres de Gabriel Alberto sería entonces exageradamente alta. Pero en este caso, no estamos ante la amputación inmediata de un brazo, tras un accidente. Tenemos ante nuestra consideración un menor a quien se le causó un disloque de sus funciones musculares, nerviosas y óseas, con sustanciales consecuencias de sufrimiento para sus padres que comenzaron *1000 desde su nacimiento, como en el caso de Riley. Por otro lado, a diferencia de Merced, el sufrimiento de los padres se mitigará con la prótesis sobre la que abundaremos más adelante, aunque no se eliminará. Estimamos que luego de tomar en consideración cálculos mecánicos y ponderar los hechos diferentes de este caso, debemos reducir la cuantía otorgada. Esto nos lleva a una compensación de $260,000 para doña María Cristina y $150,000 para don Andrés.
4. La compensación monetaria a Gabriel Alberto
Gabriel Alberto sufrió una lesión al plexo braquial izquierdo que resultó en una parálisis permanente. La jueza de primera instancia observó las limitaciones físicas que Gabriel posee y lo afectado que estaba emocionalmente. Escuchó y examinó la prueba pericial que corroboró lo que ella había visto. La evaluación de esa prueba, según realizada por el tribunal sentenciador y la credibilidad que le merecieron los testimonios vertidos en su presencia, debe ser objeto de gran deferencia por los tribunales apelativos. En ausencia de circunstancias extraordinarias que demuestren pasión, prejuicio, parcialidad o error manifiesto, no debemos intervenir con esas determinaciones de hechos. Álvarez de Choudens et. als. v. Rivera Vázquez, supra.
A Gabriel Alberto le fueron compensados daños físicos y morales. Sobre los daños físicos, la prueba en que se basa la compensación es pericial. Los tribunales apelativos estamos en la misma condición que los de instancia para aquilatar ese tipo de prueba. Dye-Tex P.R., Inc. v. Royal Ins. Co., P.R., 150 D.P.R. 658, 662 (2000). En este caso estuvo compuesta del testimonio y el informe pericial del doctor Néstor Cardona Cando y los informes periciales de los doctores Daría Fernández Demorizi y Filí-Melé Rodríguez. En lo pertinente, el Dr. Cardona declaró:

“P Okay. Cuando usted lo examinó, ¿cuáles eran las quejas principales del, el menor?

R Sí, le digo ahora. Básicamente, pérdida de función de la mano, este, no poder agarrar. Él decía que podía mover el pulgar para, ese día tenía un “Game Boy ” de esos y estaba jugando con él. Pero realmente al, al examen físico lo que hacía era darle al botón contra el dedo. O sea, usar el, el dedo como un, como un poste. Y que debido a la pérdida de función de la extremidad, pues no podía amarrarse los zapatos, este, no podía enganchar el “zipper”. O sea, él podía, puede con la mano derecha subirse el “zipper”, pero hay que lazarlo primero. No podía abotonar y desabotonarse, ni trabajar una correa.

(...)

P Okay. ¿Le practicó usted al menor un examen físico?

R Sí, ese examen físico se practicó. Encontramos, aparte de la descripción que ya cubrimos, que tenía movilidad activa del hombro. Pasivamente, o sea, cuando uno se lo mueve, tenía un movimiento casi completo en, en todos los planos, con excepción de rotación interina, que es esto, que era cero (0).

(...)

P Bueno, el diagnóstico, de acuerdo a su informe es...

R Parálisis del plexo braquial izquierdo con...motor y sensorial de todos los tres (3) troncos del plexo.

P Okay. Finalmente, ¿cuál es su, su opinión respecto al, a la prognosis e impedimento en el caso de Gabriel.

R Bueno, lo primero, como usted me preguntó horita, la condición está estable. O sea, esto no va a mejorar más de lo que está, este, y tampoco va a empeorar. O sea, él se queda así por el resto de su vida. Este, y que, *1001 básicamente, tiene un brazo que para todos los efectos prácticos es inservible. O sea, no, él no puede hacer nada con el brazo. Es lo mismo que si no lo tuviera. Pero sí, goza de la definición de impedimento. Hay un procedimiento. (...) Entonces, vamos a las tablas. O sea, tenemos aquí tres (3) impedimentos, cuatro (4) impedimentos distintos: ochenta y uno (81) por ciento de impedimento de la extremidad por pérdida de sensación, setenta y cinco (75) por ciento de impedimento por, de la extremidad por pérdida del tronco superior, dieciocho (18) por ciento de impedimento de la extremidad por pérdida defunción del tronco medio y setenta (70) por ciento de la extremidad por pérdida del, del tronco inferior. Entonces éstos se combinan. No se suman porque sino tendría, caray, trescientos (300) y pico por ciento y no hace sentido. Se combinan en las tablas y eso te dice que él tiene un noventa y nueve (99) por ciento de pérdida de función de la, de la extremidad por su déficit motor y sensorial. Entonces va a la tabla, que te hace la conversión, que te dice que eso resulta que es un cincuenta y nueve (59) por ciento de impedimento de funciones fisiológicas generales. Lo cual en estos casos de extremidad a mí me gusta, particularmente en casos grandes, me gusta hacer un pequeñito ejercicio mental, y es compararlo con una amputación. Bien. Si tú vas a la tabla y buscas cuál es la amputación, si tú le desarticularas el brazo, o sea, no tiene nada del brazo, te dice que sería sesenta (60) por ciento. Lo cual hace una diferencia porque tiene un poquito defunción en su codo.

P Y ese, este impedimento, Doctor, le pregunto, si es de carácter permanente.

R Permanente.

(...)

R Una de las cosas que yo le mencioné a la mamá en términos de función... O sea, yo soy fisiatra. A mí me gusta que la gente te pueda funcionar. O sea, esa es mi responsabilidad. Es que él tiene un brazo que es totalmente inservible. ¿Okay? Que en algún momento podrían considerar, y esto sería para que él lo considere cuando sea un adulto porque nadie va a tomar esta decisión por él, que estaría mejor sin el brazo. Si a él le amputaran el brazo y le pusieran una prótesis, lo que se llama un “mutual arm", él podría usar ese, ese...Esa prótesis podría usarla para hacer actividades bilaterales. (...)

(...)

P ¿Yesa es su recomendación?

R Que lo consideren. Yo creo que cuando él tenga edad para ser un adulto y considerar los pros, contra, este, es algo que debe hacer.

(...)

P Pero ¿cómo, cómo se afecta la vida funcional de una persona con los daños que tiene Gabriel?

R ...O sea, aquí nada más puede usar un brazo. Por lo tanto, cualquier actividad que tú vayas a usar, que necesites los dos (2), las dos (2) manos, del diario vivir, no las va a poder hacer. Este, no se puede poner botones. O sea, uno tendría que usar un “hook” para ponerse botones. Uno no se puede amarrar zapatos con una mano. Es imposible. O sea, habría que hacer, eventualmente, ponerse los zapatos de meter y sacarlos o zapatos con cierre de velero. Pero definitivamente amarrarlos, no los va poder hacer. Este...se dificulta para comer. O sea, uno no puede cortar carnes con una (1) sola mano. Este, vienen, platos especiales para, por ejemplo, cuando tiene arroz, por ejemplo, y no, no puedes usar tenedor para empujar, pues vienen unos especiales que tienen un, una hebilla... Obviamente, esos no los va a tener en los restaurantes. O sea, se afecta todos los aspectos de la vida, definitivamente.

*1002
P Finalmente, ¿cómo se afecta la vida ocupacional, laboral de una persona con este tipo de daño?

R De la misma forma, más vale que se ponga a estudiar y que le paguen por pensar en vez de sudar porque, o sea no va poder hacer trabajos manuales. Este, sabe, va a tener que aprender a, a estudiar algo que le paguen por saber. Como ustedes, que no sudan. ”

Explicó el Dr. Cardona en su informe:

“On physical examination, we found clear and objective evidence of loss of function of nearly the entire left brachial plexus. The only muscle that retained adequate strength was the left biceps muscle. For that reason the patient has now been left with an elbow flexion contracture since there is no antagonistic function of the left triceps muscles. The patient reported being able to use his thumb in order to push buttons in a Game Boy, however on physical examination we found no preserved function of any of the finger flexors. We consider that it is likely that he pushes the Game Boy against his thumb in order to depress the buttons. Aside form some degree of preserved wrist extension and left extensor indices propius there is no preserved function of nay muscle group that moves digits.

With respect to future management of Gabriel’s left upper extremity condition, we would not foresee that he would require any additional intervention at this time. Prior to our evaluation, Mrs. Rivera has been advised regarding the possibility that at some time he undergo a left upper extremity amputation with subsequent placement of a prosthesis. The patient’s mother however was very clear in responding that that would be a decision that Gabriel would have to take on his own when he reached the appropriate age. We would like to comment that at present based on our physical examination Gabriel has a completely useless left upper extremity. We do consider that in his case the possibility of a left shoulder disarticulation surgery with the subsequent placement of a myoelectric arm is a possibility that should be entertained from a functional standpoint. It is clear to us that with proper training following the placement of a left shoulder disarticulation myoelectric prosthesis that his degree of function would be improved when compared to what he has now. This is an important consideration in this case because aside from the surgery to disarticulate the shoulder the cost for that type of prosthesis is significant and would require routine changes of battery and regular maintenance which would further increase his subsequent cost for medical treatment. ” (Énfasis Nuestro).
El doctor Filí-Melé Rodríguez recomendó, al igual que el Dr. Cardona, la amputación del brazo lesionado y la colocación de una prótesis. A esos efectos, indicó:

“I review the physical evaluation, the available medical history and following the recommendation of Dr. Néstor Cardona Cando in his report of October 11,2004 of a possible Shoulder Disarticulation Amputation.

I understand that a decision to amputate would be a difficult one, made by a patient typically not of tender years. I also know that as he ages the restriction of motion and lack of dexterity will influence the decision-making processes for his future.

The most important factor is that Gabriel has an arm that is completely dysfunctional, which is his chief complaint today and a prosthesis will allow the possibility of performing two-handed activities of daily living (ADL) as simple as buttoning his shirt. I also need to take into account that now he is a young child with little or no responsibilities and a-mother to help him in his ADL, which may no be the case as he enters adulthood.' Everything he does will require a lot more effort than it does a two-handed person.

There is also the cosmetic aspect, which needs to be taken into consideration. GabrieVs arm is noticeably underdeveloped and will be even more noticeable as he grows.

*1003
My professional recommendation would be for Gabriel to have a Shoulder Disarticulation prosthesis with myoelectric control of the elbow, wrist and hand, dual electrodes and switches for control of the shoulder motions. The prosthesis captures through these electrodes the electrical impulses fired when the remaining muscles move. At present Gabriel’s best alternative would be a prosthesis known as the Utah Arm 3. ”

El costo del procedimiento fue desglosado en la sentencia impugnada. Asciende a $969,500. El Dr. Ramírez plantea que esa partida es especulativa porque depende de un futuro incierto: que al llegar a su mayoría de edad, Gabriel podría decidir no amputarse su brazo izquierdo e instalarse una prótesis. En Torres Ortiz v. Plá, 123 D.P. R. 637, 654 (1989), el Tribunal Supremo eliminó una partida concedida a los demandantes. Determinó:

“La partida de $18,188.68, por menoscabo de oportunidades de empleo y reducción de ingreso, debe ser totalmente eliminada por especulativa y carente de fundamento en la prueba presentada. La misma parte de la premisa de que al reintegrarse al empleo la madre recibirá $1,584.00 menos al año de lo que hubiera recibido de no haber tenido que ausentarse del mercado laboral. No se ofrece explicación alguna para dicha conclusión. El informe del perito está totalmente huéifano de un fundamento razonable para el Tribunal adoptar tal teoría”.

Los daños físicos sufridos por Gabriel Alberto no son especulativos. Abundante evidencia pericial demuestra que el brazo izquierdo del menor es completamente disfimcional e inservible; que esta condición solamente se puede mitigar si se amputa el brazo y se le instala una prótesis, cuando ya su cuerpo haya completado su desarrollo. Dos peritos confirmaron esta única oportunidad de compensar a Gabriel Alberto en cuanto al impacto permanente del daño que se le causó.
Ahora bien, la cantidad de $969,500, concedida a Gabriel Alberto por la jueza de primera instancia, es única y exclusivamente para la prótesis. Está claro que esta compensación debe quedar bajo la tutela del Tribunal, como es norma en casos de fondos de menores. El dinero debe consignarse en el Tribunal de Primera Instancia en una cuenta restricta para cuando se realicen los procedimientos de amputación, instalación y mantenimiento de la prótesis. Esto no excluye que las partes le sometan al Tribunal alguna otra alternativa, como un fideicomiso, que provea las garantías suficientes para que los fondos estén disponibles para el propósito al que fueron destinados. Si al quedar emancipado, Gabriel Alberto decidiera no hacerse amputar su brazo para instalarse la prótesis, deberá devolver el dinero consignado con sus intereses acumulados.
Por otra parte, la jueza de primera instancia estimó los sufrimientos y angustias mentales de Gabriel en $600,000. La doctora Daría Fernández Demorizi concluyó en su informe que:
“[E]l paciente sufre un trastorno afectivo tipo Depresión Mayor. Entendemos que su condición se debe a la pérdida, defunción y atrofia de su brazo izquierdo, por la parálisis de plexo braquial ocurrida al momento de su nacimiento. Entendemos que este niño ha sufrido y sufrirá pérdidas en todos los ámbitos de su vida. Sufrió daños y pérdidas desde su nacimiento hasta el presente, ya que la lesión al plexo braquial impidió la regeneración de los nervios, los cuales no estimularon el desarrollo muscular apropiado causándole a temprana edad deformidad y debilidad de la extremidad y limitación de movimiento sincrónicos de las extremidad superior (no pudo agarrar objetos como ambas manos, tirar pelotas, levantar sus libros, jugar video-juegos, nadar, defenderse apropiadamente en situaciones de peligro: como agarrarse para no caerse, pérdidas afectivas porque estuvo y estará impedido de mostrar afecto abrazando a sus seres queridos).

Estas limitaciones lo llevaron al ostracismo, impotencia y frustración. Se vio y se verá siempre como “el manco”. Cuando llegue a la adolescencia, no podrá relacionarse adecuadamente con sus padres, ya que sus actividades se verán severamente limitadas. No será capaz en la adolescencia de abrazar parejas o conducir un automóvil. Las limitaciones en su juventud temprana vendrán primero por el aspecto académico. No podrá ser Ingeniero Mecánico como su padre (lo cual es su sueño, ya que su hermano mayor también quiere serlo). Nunca podrá ser un cirujano, ser un programador o ingeniero de computadoras ni ser un chef. No podrá estudiar 
*1004
carreras técnicas que requieran capacidad manual. No podrá ser músico, chofer, piloto de aviones, arquitecto, albañil, ebanista, zapatero o paracaidista.

Como adulto, se verá limitado en actividades como bailar, reparar averías, pintar casas, limpiar aires acondicionados, pasar la máquina del césped o simplemente poder apoyarse o agarrarse para defenderse de una caída. Las limitaciones de Gabriel fueron, son y serán irreparables. Gabriel fue, es y será un niño marcado severamente por sus limitaciones físicas, afectivas sociológicas y psicológicas. La condición de Depresión Mayor que padece Gabriel, entendemos que se debe enteramente a la lesión permanente de su brazo izquierdo.” (Enfasis Nuestro)
Los daños morales sufridos por Gabriel Alberto quedaron sostenidos por la prueba. Sin'embargo, estimamos que la suma otorgada es exageradamente alta. En Riley v. Pacheco, supra, el Tribunal Supremo eliminó la partida concedida a la niña por sus sufrimientos y angustias mentales. A esos efectos, indicó:
“Varios factores influyen en esta conclusión. Primero tenemos presente que por su corta edad, durante los primeros meses de su infancia, la niña Sylvia no podía, como tal, sufrir daños mentales dentro del significado jurídico-compensatorío. ” Correa v. Autoridad Fuentes Fluviales, 83 D.P.R. 144, 160 (1961). (Énfasis nuestro)
Gabriel Alberto, a diferencia de la niña Sylvia, ha sufrido y sigue sufriendo daños morales. Él está consciente de lo que le ocurre y esto le afecta emocionalmente. Así lo indicó la doctora Fernández Demorizi en el informe pericial que sometió al Tribunal.
El Tribunal Supremo ha compensado las angustias mentales de niños menores de edad que han sufrido, después de sus primeros meses de infancia, alguna incapacidad a consecuencia de la culpa o negligencia de otro. En Merced v. Gobierno de la Capital, supra, se le concedieron al menor que se le había amputado el brazo izquierdo, $24,000 por sus daños. Esta cuantía ajustada al año 2007 equivale, aproximadamente, a $264,000. Merced v. Gobierno de la Capital, supra, es sólo un parámetro. Tomando en consideración las circunstancias particulares de este caso, resolvemos que la cantidad conferida a Gabriel Alberto por sus sufrimientos y angustias mentales debe reducirse a $300,000.
5. Sentencia Nunc Pro Tune
Las enmiendas relativas a errores de forma están reguladas por la Regla 49.1 del Procedimiento Civil, 32 L.P. R.A. Ap. III, la cual dispone:

“Los errores de forma en las sentencias, órdenes u otras partes del expediente y los que aparezcan en las mismas por inadvertencia u omisión, podrán corregirse por el tribunal en cualquier tiempo, a propia iniciativa, o moción de cualquier parte, previa notificación, si ésta se ordenare. ”

Esta regla tiene el propósito de permitir al tribunal que dictó sentencia corregir cualquier error de forma, mecanográfico, o que no pueda considerarse que va a la sustancia de la sentencia, orden o resolución, ni que se relacionan con asuntos discrecionales. S.L.G. Coriano-Correa v. K-mart Corp., 154 D.P.R. 523, 529 (2001). El Tribunal Supremo ha señalado constantemente que “si el derecho a cierto remedio está claramente sostenido por el expediente, la omisión en concederlo es subsanable, por ser error de forma, mediante enmienda nunc pro tunc.” Security Ins. Co. v. Tribunal Superior, 101 D.P.R. 191, 204 (1973); S.L.G. Coriano-Correa v. K-mart Corp., supra, a la pág. 530; Vélez Seguinot v. A.A.A., resuelto el 18 de mayo de 2005, 2005 JTS 74, 163 D.P.R. _ (2005). Pero cuando la controversia trate sobre una cuestión de interpretación de ley, aunque esté involucrado un cálculo matemático, no procede utilizar la Regla 49.1 de Procedimiento Civil. Los alegados errores de derecho no pueden alterarse mediante enmienda nunc pro tunc. S.L.G. Coriano-Correa v. K-Mart Corp., supra.
*1005 Plantea el Dr. Ramírez que el tribunal apelado carecía de autoridad para aumentar la compensación, otorgada a Gabriel, mediante el mecanismo de sentencia nunc pro tune. Pero la jueza de primera instancia lo que hizo fue desglosar en la sentencia enmendada los gastos de amputación, instalación y mantenimiento de la prótesis. Estos costos no habían sido incluidos en la sentencia original a pesar de que se detallaban en el informe pericial que fue incorporado a la sentencia. A esos efectos, indicó la jueza:
“Para una amplia, específica y científica explicación del procedimiento y su costo, el Tribunal incorpora a la presente sentencia el informe pericial del doctor Filí-Melé Rodríguez, (Exhibit II estipulado por las partes). ”
El Tribunal de Primera Instancia, al momento que emitió la sentencia emnendada, retenía jurisdicción sobre el caso. Podía corregir su error y enmendar la sentencia. El mecanismo que utilizó fue el correcto. Ella había cometido un error de forma. Había omitido explicitar un derecho a cierto remedio que está claramente sostenido por el expediente, según lo permite la pauta jurisprudencial, Security Ins. y su secuela.
6. Honorarios de Abogado
La Regla 44.1(d) de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 44.1(d), dispone, en lo pertinente, lo siguiente:

“En caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta.

Descansa en la sana discreción del tribunal determinar si una parte ha sido temeraria. No revisamos ese tipo de determinación, salvo que haya mediado un claro abuso de discreción por parte del tribunal al hacerla. ” Asociación de Condómines v. Trilla Reyes, 120 D.P.R. 574, 579 (1988).
El Dr. Ramírez plantea que en este caso no procedía la imposición del pago de honorarios de abogado. Pero la temeridad manifestada por él la hemos podido verificar nosotros. Ha pretendido volver a litigar en apelación un asunto resuelto en sentencia parcial final y firme. Ha argumentado que no hubo testimonios en récord cuando él los había estipulado. Nosotros podríamos aumentar la cantidad impuesta por el Tribunal de Primera Instancia. Pero en vista de que hallamos razón en su principal alegato ante nosotros en este recurso —las cuantías concedidas a los demandantes, por sus daños morales, fueron ajustadas — , no habremos de hacerlo.
Por los fundamentos que anteceden, se modifica la Sentencia apelada para reducir las compensaciones otorgadas según lo hemos aquí resuelto y para que tanto los fondos destinados a la prótesis como los correspondientes a los daños morales sufridos por el menor sean depositados en el tribunal; así modificada, se confirma.
Lo acordó el Tribunal y lo certifica la Secretaria.
Leda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones